**Oral Argument Not Yet Scheduled**

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 11-3034, 11-3043 & 11-3044

**United States,**

*Appellee*,

vs.

**William Cordova, José Gutierrez
& Melvin Sorto,**

*Appellant*.

**On Appeal from the
United States District Court
For the District of Columbia
08-Cr.-167**

# Joint Brief of Appellants

Mary E. Davis*
Davis & Davis
1350 Connecticut Avenue, N.W.
Suite 202
Washington, D.C. 20036
(202) 234-7300
Counsel for William Cordova

Anthony D. Martin*
7841 Belle Point Drive
Greenbelt Maryland 20770
(301) 220-3700
Counsel for José Gutierrez

Robert S Becker*
5505 Connecticut Avenue, N.W.
No. 155
Washington, D.C. 20015
(202) 364-8013
Counsel for Melvin Sorto

*Counsel of Record
 Appointed by the Court

Filed: May 16, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. PARTIES AND AMICI.

Appellants William Cordova, José Gutierrez and Melvin Sorto, and Appellee the United States of America appeared in the United States District Court for the District of Columbia. Thomas Abbenante represented Mr. Cordova, Anthony D. Martin represented Mr. Gutierrez, and Mitchell M. Seltzer represented Mr. Sorto. Assistant U.S. Attorneys Gilberto Guerrero and Nihar R. Mohanty represented the United States.

### B. RULINGS UNDER REVIEW

At issue before this Court are Appellants' convictions December 8, 2010 by a jury, and their sentences imposed by Judge Richard J. Leon. Appellants' judgments of conviction are reproduced in the Joint Appendix. JA **.[1]

### C. RELATED CASES

This case has not previously been before this Court, and no other cases currently on appeal are related to it.

## STATUTES & RULES

Pursuant to Fed. R. App. P. 28(f) and D.C. Cir. R. 28(a)(5), relevant statutes and rules are set forth in the Addendum to this brief.

---

[1] Pursuant to Fed. R. App. P. 30(c) and D.C. Cir. R. 30(c), the parties have agreed to file a deferred joint appendix.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....... ii

STATUTES & RULES ..................................................................... ii

TABLE OF AUTHORITIES ..............................................................v

STATEMENT OF JURISDICTION...................................................1

ISSUES PRESENTED ......................................................................1

STATEMENT OF THE CASE ..........................................................3

STATEMENT OF FACTS .................................................................6

    The July 30, 2006 assault in Alexandria ...................................6
    The Ventura homicide April 22, 2007.......................................7
    The Esquina-Flores assault June 1, 2007 .................................8

SUMMARY OF THE ARGUMENT ................................................10

ARGUMENT ..................................................................................13

    RESTRICTIONS ON ACCESS TO DISCOVERY DEPRIVED APPELLANTS OF
    THEIR SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION AND
    THEIR RIGHT TO ASSIST THEIR LAWYERS .......................................13

        Standard of Review.............................................................16
        The Trial Court violated Appellants' Sixth Amendment rights ..............17
        The Trial Court failed to employ procedural safeguards to protect
        Appellants' Sixth Amendment rights .................................21
        The interference with Appellants' ability to defend themselves
        was not harmless .................................................................25

    THE JUDGE'S REFUSAL TO RECUSE HIMSELF DEPRIVED APPELLANTS OF
    THEIR SIXTH AMENDMENT RIGHT TO BE TRIED BEFORE AN IMPARTIAL
    TRIBUNAL ..................................................................................26

        Standard of review..............................................................26
        An objectively reasonable observer would have questioned the
        Judge's impartiality ............................................................27

    AN OFF-THE-RECORD, IN-CAMERA DISCUSSION OF FINAL JURY
    INSTRUCTIONS VIOLATED APPELLANTS' TRIAL AND APPELLATE RIGHTS..........34

        Standard of review..............................................................35
        Appellants' Constitutional Rights Were Violated ....................................36
        Appellants Had a Right to be Present Pursuant to Fed. R. Crim.
        P. 43 ....................................................................................37

Appellants did not waive their presence.........................................38
Failure to create a record deprived Appellants of effective
representation in this Court...........................................................39
THE INDICTMENT BLOATED WITH MULTIPLICITOUS SUBSTANTIVE
CHARGES WAS HIGHLY PREJUDICIAL ...............................................41
Standard of review.........................................................................42
Inclusion of D.C. Code offenses violated the Fifth Amendment ..............43
The Trial Court's failure to resolve the multiplicity of charges
before deliberations began was plain error.....................................52
Appellants did not waive their right to challenge the
multiplicitous charges...................................................................53
APPELLANTS' SENTENCES ARISING FROM THE APRIL AND JUNE 2007
INCIDENTS VIOLATE THE FIFTH AMENDMENT DOUBLE JEOPARDY
CLAUSE ..............................................................................................55
THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING AN
ENGLISH-SPEAKING GOVERNMENT WITNESS TO TESTIFY IN SPANISH
THROUGH INTERPRETERS .....................................................................57
Standard of review.........................................................................57
Misael Esquina-Flores did not need an interpreter ......................57
Denial of the motions violated Appellants' constitutional rights............59
The Trial Court violated 28 U.S.C. § 1827 ...................................60
APPELLANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THEY WERE
DENIED THEIR RIGHT TO REPRESENTATION BY TWO ATTORNEYS
PURSUANT TO 18 U.S.C. § 3005 ..........................................................62
Introduction..................................................................................62
Standard of review.........................................................................62
The statutory right to two attorneys .............................................62
Cases Interpreting § 3005 ............................................................63
The Court abused its discretion by not allowing the continued
representation of two attorneys.....................................................67
THERE WAS INSUFFICIENT EVIDENCE TO CONVICT MR. CORDOVA AND
MR. GUTIERREZ OF MAIMING IN AID OF RACKETEERING ......................68
Standard of review.........................................................................69
The government produced no motive evidence linking the assault
to Appellants' gang status ............................................................69
CONCLUSION..............................................................................72
ADDENDA ...................................................................................A-1

# TABLE OF AUTHORITIES[†]

## CASES

*Alford v. United States*, 282 U.S. 687 (1931) --------------------------------------- 21

*Ball v. United States*, 470 U.S. 856 (1985) ---------------------------------------- 44

*Blockburger v. United States*, 282 U.S. 299 (1932) --------------------- 46, 47, 49, 50

*Brookhart v. Janis*, 384 U.S. 1 (1966) ------------------------------------------- 38

*Chapman v. California*, 386 U.S. 18 (1967) --------------------------------- 17, 36, 43

*Coleman v. Alabama*, 399 U.S. 1 (1970) ----------------------------------------- 18

*Crum v. Hunter*, 151 F.2$^d$ 359 (10th Cir. 1945) ----------------------------------- 62

*Davis v. Alaska*, 415 U.S. 308 (1974) --------------------------------------------- 18

*Douglas v. California*, 372 U.S. 353 (1963) --------------------------------------- 35

*Drew v. United States*, 331 F.2$^d$ 85 (D.C. Cir. 1964) ------------------------------- 52

*Evitts v. Lucey*, 469 U.S. 387 (1985) --------------------------------------------- 35

*\*Faretta v. California*, 422 U.S. 806 (1975) -------------------------------- 18, 19, 37

*Furman v. Georgia*, 408 U.S. 238 (1972) --------------------------------------- 63, 64

*Garrett v. United States*, 471 U.S. 773 (1985) --------------------------------- 47, 48

*Geders v. United States*, 425 U.S. 80 (1976) -------------------------------------- 19

*Glasser v. United States*, 315 U.S. 60 (1942) ------------------------------------- 38

*Hopt v. Utah*, 110 U.S. 574 (1884) ------------------------------------------------ 36

*In re Murchison*, 349 U.S. 133 (1955) --------------------------------------------- 34

*\*In re Nettles*, 394 F.3$^d$ 1001 (7th Cir. 2005) ------------------------------------- 33

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ------------------------------------------- 38

*Jones v. Pittsburgh Nat'l Corp.,* 899 F.2$^d$ 1350 (3$^d$ Cir.1990) ----------------------- 27

*Lancaster v. Maryland*, 978 A.2$^d$ 717 (Md. 2009) --------------------------------- 18

*Maryland v. Craig*, 497 U.S. 836 (1990) ------------------------------------------ 59

*McElroy v. United States*, 164 U.S. 76 (1896) ------------------------------------- 52

*Missouri v. Hunter*, 459 U.S. 359 (1983) ----------------------------------- 44, 47

*Ohio v. Roberts*, 448 U.S. 56 (1980) ---------------------------------------------- 59

*\*Pietrzak v. United States*, 188 F.2$^d$ 418 (5th Cir. 1951) ---------------------------- 60

*Pointer v. Texas*, 380 U.S. 400 (1965) -------------------------------------------- 18

---

[†] Citations to precedents principally relied upon are preceded by asterisks (*).

*Press Enterprise v. Superior Court*, 464 U.S. 501 (1984) -------------- 17, 21, 25, 61

*Rogers v. United States*, 422 U.S. 35 (1975)--------------------------------------- 37, 38

*Roviaro v. United States*, 353 U.S. 53 (1957) ------------------------------------21

*S.E.C. v. Loving Spirit Foundation, Inc.*, 392 F.3$^d$ 486 (D.C. Cir., 2004) ---------27

*Sao Paulo v. Am. Tobacco Co.*, 535 U.S. 229 (2002) --------------------------------27

*Schmuck v. United States*, 489 U.S. 705 (1989)----------------------------------54

*Smith v. Illinois*, 390 U.S. 129 (1968) ----------------------------------------------21

*Smith v. United States,* 353 F.2$^d$ 838 (D.C. Cir 1965) -------------------------------67

*Snyder v. Massachusetts*, 291 U.S. 97 (1934) ------------------------------- 19, 36

*Strickland v. Washington*, 466 U.S. 668 (1984) ------------------------------- 18, 26

*Sullivan v. Louisiana,* 508 U.S. 275 (1993)----------------------------------------36

*Thomas v. United States*, 602 A.2$^d$ 647 (D.C. 1992)-----------------------------------42

*\*United States v. Anderson*, 59 F.3$^d$ 1323 (D.C. Cir. 1995) -----------------42, 55, 56

*\*United States v. Boone*, 245 F.3$^d$ 352 (4th Cir. 2001)----------------------------------63

*\*United States v. Bruno*, 383 F.3$^d$  65 (2$^d$ Cir. 2004) ----------------------------- 70, 71

*United States v. Canty*, 469 F.2$^d$ 114 (D.C. Cir. 1972) ------------------------- 44, 47

*United States v. Carillo*, 229 F.3$^d$ 177 (2$^d$ Cir. 2000)----------------------------------41

*United States v. Carson*, 455 F.3$^d$ 336 (D.C. Cir. 2006) ------------------------- 54, 55

*United States v. Carter*, 576 F.2$^d$ 1061 (3$^d$ Cir. 1978)-----------------------------------43

*United States v. Casseus*, 282 F.3$^d$ 253 (3$^d$ Cir. 2002)------------------------------------65

*\*United States v. Cells*, 608 F.3$^d$ 818 (D.C. Cir. 2010)--------------------------- 21, 25

*United States v. Clarke*, 24 F.3$^d$ 257 (D.C. Cir. 1994)-----------------------------------53

*United States v. Cronic*, 466 U.S. 648 (1984) --------------------------------------26

*United States v. Cunningham*, 145 F.3$^d$ 1385 (D.C. Cir. 1998) ----------------------36

*United States v. Cureton*, 739 F.3$^d$ 1032 (7th Cir. 2014)-----------------------------56

*United States v. Dandy,* 998 F.2$^d$ 1344 (6th Cir. 1993)----------------------------------33

*United States v. Douglas*, 525 F.3$^d$ 225 (2$^d$ Cir. 2008) ------------------------------65

*United States v. Dufur*, 648 F.2$^d$ 512 (9th Cir. 1980)---------------------------------64

*United States v. Edelin, et al.*, Dkt. No. 98-Cr-264 --------------------------------68

*United States v. Edwards*, 159 F.3$^d$ 1117 (8th Cir. 1998)-----------------------------66

*United States v. Fuller*, 455 F.2$^d$ 1338 (D.C. Cir. 1971) ----------------------------52

*United States v. Gagnon,* 470 U.S. 522 (1985)-------------------------------------36

*United States v. Gooch,*  665 F.3$^d$ 1318 (D.C. Cir. 2012) ---------------------------69

*United States v. Gordon*, 829 F.2$^d$ 119 (D.C. Cir. 1987) -------------------------------38

*United States v. Gray, et al.*, Dkt. No. 00-Cr.-157 -------------------------- 68

*United States v. Green*, 599 F.3[d] 360 (4th Cir.), *cert. denied*, 131 S. Ct.
271 (2010) ---------------------------------------------------------------- 69

*United States v. Grimes*, 142 F.3[d] 1342 (11th Cir. 1998) --------------------- 65

*United States v. Harley*, 990 F.2[d] 1340 (D.C. Cir. 1993) --------------------- 54

*United States v. Harris*, 959 F.2[d] 246 (D.C. Cir. 1992) ---------------------- 53

*United States v. Hemphill*, 514 F.3[d] 1350 (D.C. Cir. 2008)---------------------- 43

*United States v. Holland*, 519 F.3[d] 909 (9th Cir. 2008) --------------------- 33

*United States v. Hoover-Hankerson*, 511 F.3[d] 164 (D.C. Cir. 2007) --------------- 35

*United States v. Jones*, 527 F.2[d] 817 (D.C. Cir. 1975) ------------------- 46, 47

*United States v. Kayode*, 254 F.3[d] 204 (D.C.Cir.2001)-------------------------- 69

*United States v. Knight*, 509 F.2[d] 354 (D.C. Cir. 1974) --------------------- 46

*United States v. Kostadinov*, 721 F.2[d] 411 (2[d] Cir. 1983)-------------------- 66

*United States v. Langford*, 946 F.2[d] 798 (11th Cir. 1991) --------------------- 43

*United States v. Mahdi*, 598 F.3[d] 883 (D.C. Cir. 2010) ------------47, 48, 49, 50, 52

*United States v. Marquardt*, 786 F.2[d] 771 (7th Cir. 1986)-------------------- 44

*United States v. Mayans*, 17 F.3[d] 1174 (9th Cir. 1994) ------------------ 57, 61

*United States v. McLaughlin*, 164 F.3[d] 1 (D.C. 1998) ------------------- 50, 51, 52

*United States v. Microsoft Corp.*, 253 F.3[d] 34 (D.C. Cir.2001)(*en banc*)---------- 27

*United States v. Mosby*, 177 F.3[d] 1067 (8th Cir. 1999) --------------------- 33

*United States v. Owens*, 902 F.2[d] 1154 (4th Cir.1990) --------------------- 27

*United States v. Patti*, 337 F.3[d] 1317 (11th Cir. 2003) --------------------- 33

*United States v. Payne*, 591 F.3[d] 46 (2[d] Cir. 2010) ------------------------- 66

*United States v. Pray, et al.*, Dkt. No. 10-Cr.-051 -------------------------- 68

*United States v. Pulido*, 566 F.3[d] 52 (1st Cir. 2009)-------------------------- 33

*United States v. Reed*, 639 F.2[d] 896 (2[d] Cir. 1981) ------------------------ 44

*United States v. Rentz*, 735 F.3[d] 1245 (10th Cir. 2013) --------------------- 57

*United States v. Rhodes*, 32 F.3[d] 867 (4th Cir. 1994)------------------------ 38

*United States v. Sandstrom*, 594 F.3[d] 634 (8th Cir. 2010) --------------------- 57

*United States v. Severns*, 559 F.3[d] 274 (5th Cir. 2009)------------------------ 56

*United States v. Sheperd*, 513 F.2[d] 1324 (D.C. Cir. 1975) --------------------- 44

*United States v. Shepherd*, 576 F.2[d] 719 (7th Cir. 1978)-------------------- 64

*United States v. Shepperson*, 739 F.3[d] 176 (4th Cir. 2014) --------------------- 64

*United States v. Sumler*, 136 F.3[d] 188 (D.C. Cir. 1998) --------------------43, 46, 47

*United States v. Sykes*, 7 F.3$^d$ 1331 (7th Cir.1993)-------------------------------27

*United States v. Waggoner*, 339 F.3$^d$ 915 (2003) --------------------------------64

*\*United States v. Watson*, 496 F.2$^d$ 1125 (4th Cir. 1973) -------------------------- 63, 67

*United States v. Weathers (Weathers I)*, 186 F.3$^d$ 948 (D.C. Cir. 1999) ---42, 43, 53

*United States v. Weathers (Weathers II)*, 493 F.3$^d$ 229 (D.C. Cir. 2007) -----------54

*United States v. White*, 116 F.3$^d$ 903 (D.C. Cir. 1997) --------------------------------48

*United States v. Wishnefsky*, 7 F.3$^d$ 254 (D.C. Cir. 1993)-----------------------------62

*United States v. Young*, 2014 U.S. App. LEXIS 6322 (2$^d$ Cir. Apr. 4, 2014) ---------------------------------------------------------------------------------------56

*Wade v. United States*, 441 F.2$^d$ 1046 (D.C. 1971) ------------------------------- 36, 37

*\*Waller v. Georgia*, 467 U.S. 39 (1984) ----------------------------------17, 21, 34

*Ward v. Village of Monroeville, Ohio*, 409 U.S. 57 (1972)-----------------------------27

*Whalen v. United States*, 445 U.S. 684 (1980) --------------------------------------49

## STATUTES

1 Stat. 1790-------------------------------------------------------------------------------------62

8 U.S.C. § 1326--------------------------------------------------------------------------------- 3

18 U.S.C. §  2 --------------------------------------------------------------------------------- 3

18 U.S.C. §  115 ------------------------------------------------------------------------- 53, 54

18 U.S.C. §  371 ------------------------------------------------------------------------------53

18 U.S.C. §  563 ------------------------------------------------------------------------------62

18 U.S.C. §  922 --------------------------------------------------------------------------- 3, 4, 5

18 U.S.C. §  924 ------------------------------ 2, 3, 4, 5, 41, 42, 50, 51, 52, 55, 56, 57

18 U.S.C. § 1291 --------------------------------------------------------------------------------- 1

18 U.S.C. § 1513 ------------------------------------------------------------------------------50

18 U.S.C. § 1959 ------------------- 3, 4, 41, 42, 45, 46, 47, 48, 49, 50, 66, 69, 70, 71

18 U.S.C. § 1961 ------------------------------------------------------------------------------48

18 U.S.C. § 3005 --------------------------------------------------- 62, 63, 64, 65, 66, 68

18 U.S.C. § 3148 ------------------------------------------------------------------------------66

18 U.S.C. § 3231 ------------------------------------------------------------------------------45

18 U.S.C. § 3281 ------------------------------------------------------------------------------66

21 U.S.C. § 846-------------------------------------------------------------------------48, 49, 53

21 U.S.C. § 848 ------------------------------------------------------------------------------47

28 U.S.C. §  455 -------------------------------------------------------------------26, 27, 33

28 U.S.C. § 1654 --------------------------------------------------------------- 19

D.C. Code § 11-502-------------------------------------------------------------- 44

D.C. Code § 22- 401 ------------------------------------------- 3, 41, 42, 47, 51

D.C. Code § 22- 406 -------------------------------------------------------------- 42

D.C. Code § 22- 501 -------------------------------------------------------------- 51

D.C. Code § 22- 722 -------------------------------------------------------------- 53

D.C. Code § 22-1805 ---------------------------------------------------------------- 3

D.C. Code § 22-2101 ----------------------------------------------------- 3, 41, 47

D.C. Code § 22-2307 ----------------------------------------------------------- 53, 54

D.C. Code § 22-3204 ----------------------------------------------------------- 50, 51

D.C. Code § 22-4502 ----------------------------------------------------- 3, 41, 47

D.C. Code § 22-4504 ----------------------------------- 3, 4, 41, 42, 50, 52, 55, 57

Federal Death Penalty Act of 1994, 18 U.S.C. § 3591, *et seq.* ---------------------- 63

Jencks Act, 18 U.S.C. § 3500------------------------------------------- 13, 16, 25, 30

P.L.  98-473, 98th Cong., 2d Sess. (Oct. 12, 1984) ----------------------------------- 49

P.L. 105-386, 105th Cong., 2d Sess.  (Nov. 13, 1998)--------------------------------- 52

## RULES

D.C. Cir. R. 28-------------------------------------------------------------------- ii

D.C. Cir. R. 30-------------------------------------------------------------------- ii

Fed. R. App. P.  4---------------------------------------------------------------- 1

Fed. R. App. P. 10------------------------------------------------------------ 35, 39

Fed. R. App. P. 28-------------------------------------------------------------------- ii

Fed. R. App. P. 30-------------------------------------------------------------------- ii

Fed. R. Crim. P.  8----------------------------------------------------------------54

Fed. R. Crim. P. 12------------------------------------------------------- 42, 43, 53, 55

Fed. R. Crim. P. 14-----------------------------------------------------------------55

Fed. R. Crim. P. 43-------------------------------------------------------------37, 38, 39

## CONSTITUTIONAL PROVISIONS

U.S. CONST., amend. V -- 2, 10, 11, 18, 24, 34, 35, 36, 37, 39, 43, 44, 54, 55, 61, 72

U.S. CONST., amend. VI --1, 2, 10, 11, 13, 16, 17, 18, 19, 21, 25, 26, 34, 35, 36, 37, 39, 61, 68

**OTHER AUTHORITIES**

GUIDE TO JUDICIARY POLICY, Vol. 7, Defender Services, Part A
Guidelines for Administering the CJA and Related Statutes, Chapter 2:
Appointment and Payment of Counsel, Compensation of Counsel, §
230.53.20 --------------------------------------------------------------------------------- 67

Instruction 4.17, CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF
COLUMBIA, 4th Ed. 1993, 1996--------------------------------------------------------- 41

S. Rep. 98-225, Report of the Committee on the Judiciary, United States
Senate on S. 1762, 98th Cong., 1st Sess. ---------------------------------------------- 45

U.S. Attorney's Manual, § 9-110.310 --------------------------------------------------- 45

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| UNITED STATES,<br><br>       APPELLEE,<br><br>vs.<br><br>**WILLIAM CORDOVA, JOSÉ GUTIERREZ & MELVIN SORTO,**<br><br>       APPELLANTS. | Nos. 11-3034, 11-3043 & 11-3044<br>(08-Cr.-167) |

## STATEMENT OF JURISDICTION

This is an appeal from final judgments of conviction and imposition of sentences by the U.S. District Court for the District of Columbia. Each Appellant filed a Notice of Appeal within 14 days of judgment in compliance with Fed. R. App. P. 4(b), and this Court has jurisdiction pursuant to 18 U.S.C. § 1291. Appellants' notices of appeal are reproduced in the Joint Appendix. JA **.[2]

## ISSUES PRESENTED

1. Whether restrictions the Trial Court imposed on Appellants' access to discovery documents deprived them of their Sixth Amendment right to effective representation and to assist in their defense? See below, 13 – 26.

2. Whether the Trial Court's refusal to recuse itself in the face of perceived threats allegedly made by Appellant Gutierrez deprived Appellants of their Sixth Amendment right to trial before an impartial tribunal? See below, 26 – 34.

---

[2] References to the deferred Joint Appendix will be designated "JA" followed by the relevant page number(s). References to transcripts of proceedings will be designated "Tr." followed by the date of the proceeding and relevant page number, i.e. Tr. 10/28/10AM, 3.

3. Whether the Trial Court's procedure for discussing proposed jury instructions out of Appellants' presence and off-the-record deprived them of their Fifth Amendment right to Due Process and Sixth Amendment right to effective appellate representation? See below, 34 – 41.

4. Whether the Indictment was prejudicially multiplicitous because it charged Appellants with violent crimes in aid of racketeering (VICAR), federal firearms offenses and predicate D.C. Code crimes that operated as lesser-included offenses of the VICAR counts? See below, 41 – 55.

5. Whether each Appellant's sentences for VICAR offenses and D.C. violent crimes, for more than one violation of 18 U.S.C. § 924(c) arising from the same course of conduct, and for D.C. firearms offenses that merge with § 924(c) counts violate the Fifth Amendment Double Jeopardy Clause? See below, 55 – 57.

6. Whether the Trial Court erred by honoring a key government witness's preference to testify in Spanish over Appellants' Sixth Amendment confrontation right? See below, 57 – 62.

7. Whether the Trial Court deprived Appellants of adequate representation in this complex case by refusing to permit two lawyers to represent each after the government announced its decision not to seek the death penalty? See below, 62 – 68.

8. Whether there was sufficient evidence to convict Appellants Cordova and Gutierrez of maiming in aid of racketeering where government witnesses testified that the motive for the assault was retaliation for being evicted, and the government produced no evidence linking the crime to Appellants' gang status? See below, 68 – 71.

**United States v. Cordova, et al. — Page  2**

## STATEMENT OF THE CASE

Investigators arrested Melvin Sorto June 10, 2010, William Cordova June 12, and José Gutierrez June 16 on a 19-count indictment.[3] It charged each with conspiracy to commit violent crimes in aid or racketeering in violation of 18 U.S.C. § 1959(a)(5) and 18 U.S.C. § 2 (Count 1), aiding and abetting murder in aid of racketeering in violation of § 1959(a)(2) and § 2 (Count 2), aiding and abetting assault with a dangerous weapon in aid of racketeering in violation of § 1959(a)(3) and § 2 (Count 3), being an alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A) (Count 4), aiding and abetting using or carrying a firearm in relation to a violent crime in violation of 8 U.S.C. § 924(c)(1)(A) and § 2 (Counts 5 and 6), aiding and abetting first-degree premeditated murder while armed in violation of D.C. Code §§ 22-2101, 22-4502 and 22-1805 (Count 7), aiding and abetting assault with intent to kill while armed in violation of D.C. Code §§ 22-401, 22-4502 and 22-1805 (Count 8), and possession of a firearm during a violent crime in violation of D.C. Code § 22-4504(b) (Count 9).

The indictment charged Mr. Cordova and Mr. Gutierrez with maiming in aid of racketeering in violation of § 1959(a)(2) and § 2 (Count 10), threatening to commit a violent crime in aid of racketeering in violation of § 1959(a)(4) (Count 11), being an alien in possession of a firearm in violation of § 922(g)(5)(A) (Count 12), two counts of using or carrying a firearm during a violent crime in violation of § 924(c)(1)(A) (Counts 13 and 14), assault with intent to kill while armed in violation of §§ 22-401, 22-4502 and 22-1805 (Count 15), and one count of

---

[3] The fourth Defendant, William Osorio-Rivas, was arrested October 14, 2009 on counts one through nine. He pleaded guilty August 29, 2010 to an Information charging two counts of aiding and abetting assault with a dangerous weapon in aid of racketeering in violation of § 1959(a)(3) and § 2, and one count of illegal re-entry into the United States after deportation in violation of 8 U.S.C. § 1326(a).

**United States v. Cordova, et al. — Page 3**

possessing a firearm during a violent crime in violation of § 22-4504(b) (Count 16). It charged Mr. Cordova only with assault with a dangerous weapon in aid of racketeering in violation of § 1959(a)(3) (Count 17), being an illegal alien in possession of a firearm in violation of § 922(g)(5)(A) (Count 18), and using or carrying a firearm in relation to a violent crime in violation of § 924(c)(1)(A) (Count 19).

It cited special circumstances under which Appellants could receive the death penalty. But the government filed notice February 16, 2010 that it would not seek capital punishment.

Jury selection began October 18, 2010, and the government began presenting its case October 26. The jury began deliberations late December 1 and found Appellants guilty on all counts December 8.

The Judge sentenced Mr. Cordova March 24, 2011 to the mandatory sentence of life in prison without possibility of release for VICAR murder, and concurrent terms of 120 months each for the three § 922(g) offenses, 240 months each for VICAR assault and VICAR threats, 360 months for first-degree murder, 90 months each for the D.C. Code assaults, and 60 months each for two counts of possessing a firearm during a violent crime. He imposed consecutive terms of 120 months for VICAR conspiracy, 360 months for VICAR maiming, 120 months for the first § 924(c)(1)(A) offense, and 300 months each for four additional counts. Cordova's aggregate sentence is life plus 150 years, 60 months of supervised release, and special assessments totaling $1,900.

The Judge sentenced Mr. Gutierrez April 26, 2011 to the mandatory sentence of life without possibility of release for VICAR murder, and concurrent terms of 120 months each for the two § 922(g) offenses, 240 months for VICAR assault, 300 months for first-degree murder, 90 months each for the D.C. Code assaults, and 60 months each for two counts of possessing a firearm during a

violent crime. He imposed consecutive terms of 120 months for VICAR conspiracy, 360 months for VICAR maiming, 120 months for the first § 924(c)(1)(A) offense, and 300 months each for three additional counts. Mr. Gutierrez's aggregate sentence is life plus 125 years, 60 months of supervised release, and special assessments totaling $1,600.

The Judge sentenced Mr. Sorto April 27, 2011 to the mandatory sentence of life without possibility of release for VICAR murder, and concurrent terms of 120 months for the § 922(g) offense, 240 months for VICAR assault, 300 months for first-degree murder, 90 months for the D.C. Code assault, and 60 months for D.C. Code firearms possession. He imposed consecutive terms of 120 months for VICAR conspiracy, 120 months for the first § 924(c)(1)(A) offense, and 300 months for the second § 924(c) count. Mr. Sorto's aggregate sentence is life plus 45 years, 60 months of supervised release, and special assessments totaling $900.

Each Appellant filed a timely Notice of Appeal. JA **.

## STATEMENT OF FACTS

The charges in this case arose from three incidents — the wounding of Dennis Diaz-Gutierrez July 30, 2006 in Alexandria, Virginia; the fatal shooting of Edward Ventura and wounding of Nilson Maldonado April 22, 2007 in Washington, and the wounding of Feliciana Esquina-Flores June 1, 2007 in Washington. According to the government's evidence, all Appellants were involved in the April 2007 incident, Mr. Cordova and Mr. Gutierrez committed the June 2007 assault, and only Mr. Cordova was involved in the July 2006 shooting.

Mr. Sorto came to the United States in about 2001, lived in Washington with his mother and sister, and became a member of the MS-13 Sailors clique here, government witnesses testified. Mr. Cordova and Mr. Gutierrez, members of the MS-13 San Cocos clique in El Salvador, came to Washington in June and December 2006 respectively.

One government witness, Misael Esquina-Flores, knew Mr. Cordova and Mr. Gutierrez in El Salvador, and from the time he arrived, Mr. Cordova lived with Misael's family. When Mr. Gutierrez arrived, he moved into the residence as well.

### *The July 30, 2006 assault in Alexandria*

On July 30, 2006, Mr. Cordova and other MS-13 members were stopped at a traffic light in Alexandria, Virginia, according to witnesses. A car pulled up beside them carrying several young men they believed to be rival-gang members. Witnesses said Mr. Cordova and "Flaco" got out of the car, walked up beside the other vehicle, and fired several shots, wounding one passenger in the leg.

**United States v. Cordova, et al. — Page 6**

### *The Ventura homicide April 22, 2007*

Virgil Ventura,[4] a member of the 14th Street gang, testified that unidentified members of MS-13 "jumped" his brother Jesse April 21, 2007. Tr. 11/1/10AM, 77 – 8. In response to a call shortly after 10 p.m., other 14th Street members arrived in two cars, armed themselves with sticks, and went looking for MS-13 members to retaliate against. *Id.* at 78 – 80. On the way they stopped in the 2900 block of Sherman Avenue, N.W., to enlist help from friends in other gangs, including Edwin Ventura, Virgil Ventura told jurors. *Id.* at 82 – 3. Edwin and several friends had gathered on Sherman Avenue that evening preparing to celebrate Miguel Aviles's birthday. Tr. 11/10/10PM, 5. Only one person joined them, Virgil Ventura testified.

Near 11th and Lamont streets, N.W., they spotted several individuals believed to be MS-13 members and, armed with sticks, gave chase on foot, Virgil Ventura said. *Id.* at 85. The targets of their rage retreated into a building, and the attackers screamed "[t]hat they were some faggots, come out and fight like men." *Id.* When the men refused to come outside, shortly before 11:30 p.m., Virgil Ventura and his companions returned to Sherman Avenue. *Id.*

During the attack, Appellants, co-defendant William Osorio-Rivas and Misael Esquina-Flores were sitting in a white truck parked nearby, Esquina-Flores said. Tr. 11/9/10PM, 5 – 6. Rivas, a Maryland resident who was 15 years old and had no driver's license, had taken his step-father's truck without permission.

After the 14th Street members left the area, Rivas drove to a gas station on 14th Street, where other MS-13 members delivered two guns. *Id.* at 13, 17. After a brief stop on Lamont Street, Rivas drove to Sherman Avenue and Columbia Road,

---

[4] This case involves several members of the Flores and Ventura families. Where necessary for clarity, each will be identified by first and last name.

**United States v. Cordova, et al. — Page 7**

N.W., where Mr. Cordova and Mr. Gutierrez got out and fired several shots into the crowd, witnesses testified. They said Edwin Ventura was near the corner talking to his girlfriend by cell phone when shot, and Nilson Maldonado was fleeing on foot when wound in the leg. Tr. 11/8/10PM, 21.

After Mr. Cordova and Mr. Gutierrez returned to the truck, Rivas said, Mr. Sorto directed him to a house several blocks away, and took the guns inside. Tr. 11/10/10PM, 57; Tr. 11/15/10AM, 10 – 11. Mr. Sorto then gave directions to drive to a house in Springfield, Virginia, where they spent time with other MS-13 members before returning to Washington. Tr. 11/10/15AM, 11 – 12.

### The Esquina-Flores assault June 1, 2007

Misael Esquina-Flores testified that in 2004, before he came to the United States, he, Mr. Cordova and Mr. Gutierrez lived in the same neighborhood in El Salvador. Tr. 11/8/10PM, 84 – 5. Mr. Cordova arrived in Washington in summer 2006 and moved in with Misael and his family. Tr. 11/9/10AM, 5 – 7. Misael said his mother, Feliciana Esquina-Flores, helped Mr. Cordova get a job at a Five-Guys restaurant. *Id.* at 8. A short time after Mr. Cordova arrived in the United States, he acknowledged being a member of the MS-13 San Cocos clique, Misael Esquina-Flores testified. *Id.* at 19. The witness said he had begun hanging out with Mr. Cordova.

When Mr. Gutierrez, another San Cocos clique member, arrived in the United States in December 2006, he, too, began living with the Esquina-Flores family. For much of the time neither Mr. Cordova nor Mr. Gutierrez paid rent, but they ate the family's food and Mr. Cordova regularly used the phone to call El Salvador. Tr. 11/18/10AM, 54, 59 – 61.

In late May, 2007, Feliciana Esquina-Flores said she wrote a note demanding that Mr. Cordova and Mr. Gutierrez pay rent or move out. Tr.

**United States v. Cordova, et al. — Page 8**

11/18/10PM. 7 – 8. She testified that on June 1 she took her 4-year-old son to daycare, then went to a bus stop on Georgia Avenue near Otis Place, N.W., on her way to work. *Id.* at 14. While waiting for the bus she saw Mr. Cordova and Mr. Gutierrez take a bicycle out of a car about a block away and set it down. *Id.* They returned to the car with another Hispanic male, and the vehicle drove slowly toward the bus stop. *Id.* at 16. When the car neared, Mr. Cordova got out, Mr. Gutierrez handed him an object, and Mr. Cordova shot her. *Id.* at 16 – 17. The witness admitted that she could not identify the object and did not see Mr. Cordova fire a gun. *Id.*

## SUMMARY OF THE ARGUMENT

This appeal raises several distinct types of trial error that deprived Appellants of their Fifth and Sixth Amendment rights. But two threads running through it link issues together.

Several of the issues required the Trial Court to balance Appellants' constitutional interests against competing non-constitutional concerns before ruling that the latter prevailed. But the record is devoid of findings demonstrating that the non-constitutional concerns outweighed Appellants' rights, that no less intrusive procedures would have ameliorated those concerns, and that the constitutional violations were no broader than necessary to protect the competing interests.

The Trial Court's practice of addressing trial issues with counsel in off-the-record proceedings exacerbated the errors. The absence of a record makes it difficult for appellate counsel to provide effective representation and virtually impossible for this Court to conclude that Appellants' Fifth and Sixth amendment rights were adequately protected.

The Trial Court purportedly issued a protective order pretrial, permitting Appellants access to discovery documents only in the presence of defense counsel or investigators. The restrictions were necessary to maintain security and protect witnesses' safety, it asserted, but neither the protective order's terms nor the Court's findings justifying infringement of Appellants' rights to effective representation and to assist in their defense are in the record.

After the government claimed that a letter written by Appellant Gutierrez was a threat against prosecutors and the Judge, defense counsel moved pretrial to recuse the Judge. Finding that the letter was not a threat, the Judge, in error, denied the motion. From his subsequent statements and rulings, an objectively reasonable observer could have concluded that the Judge perceived the letter as a threat to

**United States v. Cordova, et al. — Page  10**

himself and other trial participants, and that his safely concerns impaired his ability to remain impartial.

The Judge held a 2¼-hour off-the-record, *in camera* discussion with counsel about jury instructions. Exclusion of Appellants from the session infringed their right to be present. Because instructional errors are among the most frequently raised issues in criminal appeals, the absence of a record has impaired their right to effective appellate representation.

The government charged Appellants with VICAR murder and VICAR assault with a dangerous weapon, and with predicate D.C. Code offenses — first-degree premeditated murder while armed and assault with intent to kill while armed. Similarly, it charged federal and D.C. firearms offenses related to the violent crimes. Because the D.C. crimes are lesser-included offenses, the indictment was prejudicially multiplicitous. Whether or not the charges were multiplicitous, sentences imposed under federal and D.C. law for the same conduct violated the Fifth Amendment Double Jeopardy Clause.

Over objection, the Trial Court honored a key government witness's preference to testify in Spanish through an interpreter. Because the Trial Court did not find that the witness was unable to speak and understand English, the decision violated Appellants' Sixth Amendment confrontation right.

Because the Indictment charged VICAR murder, a capital offense, the Trial Court initially appointed two lawyers for each Appellant. After the government decided not to seek the death penalty the Court ordered one lawyer for each Appellant to withdraw. That order erroneously deprived Appellants of representation afforded similarly situated defendants in other racketeering cases in this District and did not take into account the complexity of this case.

The government claimed that the attack on Feliciana Esquina-Flores was motivated by Mr. Cordova's and Mr. Gutierrez's interest in maintaining or

**United States v. Cordova, et al. — Page 11**

increasing their stature in MS-13. But the only motive evidence it presented demonstrated that the crime was retaliation for Feliciana Esquina-Flores's decision to evict them from her home. Because a nexus between motive and the racketeering enterprise is an essential element of a VICAR offense, the government produced insufficient evidence from which a reasonable jury could convict Appellants of VICAR maiming.

# ARGUMENT

### RESTRICTIONS ON ACCESS TO DISCOVERY DEPRIVED APPELLANTS OF THEIR SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION AND THEIR RIGHT TO ASSIST THEIR LAWYERS

The Trial Court ordered the government to disclose Jencks material every Thursday during the trial for witnesses who would be called the following week. Tr. 10/14/10, 25. Particularly in the early weeks of the trial those disclosures were massive, totaling over 1,000 pages of grand jury transcripts and other documents in a tranche.

The Judge purportedly ordered that Appellants could review the documents only in the presence of counsel or defense investigators.[5] Tr. 11/3/10PM, 3. But the record contains neither a filed order nor an in-court, on-the-record discussion in which the Judge instructed counsel not to give Appellants copies of the Jencks material.

On November 1, 2010, the beginning of the second week of trial, Mr. Sorto's investigator took to the D.C. Jail a large volume of Jencks material disclosed the previous week and left it with Appellant to review. Tr. 11/3/10PM, 64. When Mr. Gutierrez learned that Mr. Sorto had the documents he wanted them as well, prompting his lawyer to request that the Judge reconsider the protective order. *Id.* at 3, 62.

Prosecutors opposed the motion, arguing that Mr. Gutierrez's pretrial threats and the fact that this case involved MS-13 justified the protective order. They said

---

[5] The impetus for the order purportedly was a letter Mr. Gutierrez wrote that the government interpreted as a threat against the Judge, prosecutors and potential witnesses. But when the judge denied Mr. Gutierrez's motion for recusal, he dismissed the purported threats as references to a shaman in El Salvador. See below at 23, 25, 28.

**United States v. Cordova, et al. — Page  13**

giving Appellants the Jencks material posed a security risk, even though the witnesses' names had been disclosed in open court and Appellants were allowed to know what the documents contained.

The Judge denied the motion and launched an investigation into whether Mr. Sorto had made copies of the Jencks material or circulated the transcripts to other inmates.[6] He ordered Marshals not to permit Appellants to bring any papers to Court or take any from Court back to the Jail. Tr. 11/4/10PM, 9. Mr. Cordova's counsel objected that

> the defendants have a right to keep the notes … they may be taking from the trial as to what witnesses may or may not have said, and especially to reflect upon it when they're at the jail, because … when he goes back to the jail, if he remembers anything that was said during the testimony or that rings a bell or that he wants me to inquire about it, even when he goes down there for lunch, he'll come back and … will write down something on a piece of paper….
>
> So, … there has to be some limitation on the exclusion of paperwork of that nature.
>
> …
>
> … [T]he problem is that when I tell my client to go back to the jail and think about what was said here and if he remembers any discrepancies to come back, then he brings me pieces of paper with those questions on it. And if he's not allowed to do that, I think that would cause a definite problem, and I think that would interfere with his ability to effectively assist me, because that's the only way he can communicate with me.
>
> …
>
> THE COURT: … [T]here's three of you with stacks of previously provided documents that were part of the discovery in this case. Now, I'm

---

[6] Because the Judge found pretrial that Mr. Gutierrez's letter was not a threat, the government's argument and the Judge's investigation were unwarranted.

**United States v. Cordova, et al. — Page  14**

not accusing any defendant of surreptitiously taking any of those documents and including them in the pile of documents that he either entered in the courtroom with or left the courtroom with on an earlier occasion.

But I think you can see that it wouldn't be that hard to do it if the marshals were not going to … review anything they take out of the courtroom or bring into the courtroom to determine whether or not it includes things that were provided in discovery, as opposed to not provided in discovery, but a public record as opposed to not public record.

*Id.* at 12 – 15. After meeting with counsel later that day *in camera*, off-the-record,[7] the Judge said,

At the end of each court date, the counsel for the defendants will collect all papers of whatever kind that may have been either brought to court or used between counsel and their client, and keep it in their possession … overnight. With regard to returning to court the next day, the defendants will be permitted … to make notations or jot down their thoughts on paper … at the prison for the purposes of follow-up discussions with their counsel when they return … the next day [] court is in session.

The marshals will permit them to have those papers that they've written down their notes and thoughts on and permit them to return to court and present them to their counsel, and to discuss and review them with their counsel. And that's the limitation with regard to what they can bring to court, going forward…. They cannot leave the court with anything at the end of the day. It's up to each individual counsel to ensure that they collect back from their client … all documents….

… [U]nder no circumstances shall there be any additional copies of the discovery that are presented to the defense that are made for working purpose or for anyone else to see, nor under any circumstances are they to provide a copy to the defendants to keep and take with them back to the jail….

---

[7] In 2012, Mr. Sorto's appellate counsel moved to reconstruct the record of the 40-minute off-the-record proceeding November 4. In a hearing on the motion, trial counsel had only vague recollections of the discussion. Tr. 2/6/13, 15 – 24, 26 – 29.

**United States v. Cordova, et al. — Page 15**

> … Mr. Sorto's jail cell is to be searched … to … see if there are any remaining papers in that cell that are of a discovery nature, related to the discovery materials that were previously provided to Mr. Sorto in this case. I've also indicated that they can take whatever steps they believe are necessary and appropriate to check in the companion cells to satisfy themselves that no copies were provided to the inmates in the neighboring cells of Mr. Sorto under the circumstances.

*Id.* at 78 – 80.

In this case, where the disclosures were voluminous and Spanish is Appellants' first language, the Judge's Jencks disclosure schedule and the restrictions he imposed on Appellants' access to documents violated the Sixth Amendment. The error is particularly egregious because the Judge made no factual findings on the record that a compelling, overriding interest outweighed Appellants' Sixth Amendment right, that other tools at the Judge's disposal would not have alleviated the perceived security concerns, and that the protective order would have effectively alleviated those concerns.

### *Standard of Review*

The issue here is whether restrictions on Appellants' access to Jencks material deprived them of effective representation and their ability to assist their lawyers to prepare to cross-examine government witnesses. That issue requires a balancing of Appellants' constitutional rights against the government's important, but non-constitutional, security concerns.

The issue is not whether the government fulfilled its disclosure obligations under the Jencks Act, or whether the Trial Court erroneously denied access to Jencks material. Therefore, the abuse of discretion standard normally applied to rulings under the Jencks Act does not apply.

A criminal defendant's right to effective representation and to assist his lawyer in mounting a defense, like his right to a public trial, "may be overcome only by an overriding interest based on findings that [limiting the defendant's

**United States v. Cordova, et al. — Page 16**

right] is essential to preserve higher values and is narrowly tailored to serve that interest." *Waller v. Georgia*, 467 U.S. 39, 45 (1984)(*quoting Press Enterprise v. Superior Court*, 464 U.S. 501, 510 (1984)). The defendant's Sixth Amendment right may give way to "the government's interest in inhibiting disclosure of sensitive information," but "[s]uch circumstances will be rare, [] and the balance of interests must be struck with special care." *Id.* To ensure that the Trial Court strikes the proper balance, the competing "interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id*.

In this case, the record does not reflect the context in which the Judge imposed the restrictions, whether he made any factual findings and legal conclusions supporting them, or balanced the perceived security problems against Appellants' Sixth Amendment interests. Nor does it indicate whether defense counsel acquiesced in the initial decision. But shortly after the trial began, Gutierrez's counsel unsuccessfully sought reconsideration of the restrictions.

Therefore, this Court reviews for constitutional trial error. It must reverse Appellants conviction unless the government demonstrates beyond a reasonable doubt that the error was harmless. *Chapman v. California*, 386 U.S. 18 (1967).

### The Trial Court violated Appellants' Sixth Amendment rights

The Sixth Amendment states in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him; … and to have the Assistance of Counsel for his defence." U.S. CONST., amend. VI.

That right has several components, including the right to confront

witnesses,[8] the right to effective representation,[9] and the right to actively participate in and guide one's defense.[10] The importance of each reaches its apogee during cross-examination of government witnesses. Because these rights are so central to the fairness of the adversary system of criminal justice, deprivation of them is a denial of the Fifth Amendment right to due process of law. *Faretta, supra*, at 818; *Coleman v. Alabama*, 399 U.S. 1 (1970).

**Effective representation denied**

Under the Sixth Amendment, to effectively cross-examine government witnesses, counsel must have access to impeaching evidence, even in the face of significant justification for confidentiality. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 316 (1974).

Counsel must have a context in which to evaluate that evidence because cross-examination "is used not only to test a witness's memory and perceptions of what occurred, but also to impeach or discredit a witness's testimony." *Lancaster v. Maryland*, 978 A.2$^{d}$ 717, 734 (Md. 2009)(protective order preventing defendant from reviewing discovery placed "marked restraint upon counsel's tactical and strategic judgment," depriving defendant of effective representation).

As in *Lancaster*, the most damaging testimony in the case at bar came from cooperators and other witnesses with whom Appellants Cordova, Gutierrez and Sorto were well acquainted. But defense counsel and investigators, who had no opportunity to interview the witnesses pretrial, had no direct knowledge about them or what they would say on the stand. Had Appellants read the Jencks

---

[8] *Pointer v. Texas*, 380 U.S. 400 (1965).

[9] *Strickland v. Washington*, 466 U.S. 668 (1984).

[10] *Faretta v. California*, 422 U.S. 806, 814 (1975).

**United States v. Cordova, et al. — Page  18**

material, they could have identified for counsel issues about which witnesses may have lied to the grand jury or government investigators, and statements demonstrating bias. Appellants could have suggested avenues for investigation and questions that would have cast doubt on witness credibility far beyond those counsel, through intuition, might have gleaned from the statements alone.

**Participation in their defense denied**

A defendant's right to represent himself has been protected by statute since 1789, most recently by 28 U.S.C. § 1654: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." *See Faretta, supra*, at 814.

The Confrontation Clause requires the defendant's presence during critical stages of a criminal case, particularly when witnesses are examined. This is so because "it will be in [the defendant's] power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself." *Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934). "The Sixth Amendment does not provide merely that a defense shall be made for the accused…. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Faretta, supra*, at 819 – 20.

The U.S. Supreme Court has long recognized the active role a criminal defendant plays in his trial, even when he is represented by counsel. When court is not in session "[i]t is common practice … for an accused and counsel to discuss the events of the day's trial," engage in "intensive work," make tactical decisions, plan and review strategies. *Geders v. United States*, 425 U.S. 80, 88 (1976). "The lawyer may need to obtain from his client information made relevant by the day's

**United States v. Cordova, et al. — Page 19**

testimony, or he may need to pursue inquiry along lines not fully explored earlier." *Id.*

In this case, more than most, a protective order permitting Appellants to read voluminous witness testimony and statement only in counsel's or an investigator's presence effectively denied them opportunities to meaningfully assist in preparation for cross-examination.

At the end of each week the government disclosed a large amount of information about multiple witnesses to counsel. Having received the Jencks material, counsel needed to spend many hours reviewing the statements, incorporating them into planned cross-examination, and adjusting trial strategy. To the extent that documents suggested previously unknown, fruitful avenues of investigation, defense investigators needed to pursue those.

For these primarily Spanish-speaking Appellants, the time needed to read the Jencks material would have been far greater than for native English speakers. Even though counsel met regularly with their clients, who were incarcerated during trial, neither they nor their investigators had time to sit by at the jail, unable to do other trial-related work, as Appellants read that material.[11]

For these reasons a protective order that effectively denied access to statements of cooperators and other civilian government witnesses made it impossible for Appellants to exercise their right to assist counsel in defending them.

---

[11] As will be discussed below, after the government elected not to seek the death penalty, the Trial Court refused to permit two lawyers to represent each Appellant. See below at 60 – 66. That decision exacerbated the effect of the protective order.

**United States v. Cordova, et al. — Page  20**

### *The Trial Court failed to employ procedural safeguards to protect Appellants' Sixth Amendment rights*

When considering a protective order that interferes with a criminal defendant's confrontation right,

> [t]he problem … calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense, and [w]hether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the [] testimony, and other relevant factors.

*United States v. Cells*, 608 F.3ᵈ 818, 831 (D.C. Cir. 2010)(quoting *Roviaro v. United States*, 353 U.S. 53, 62 (1957))(internal quotations omitted).

Before issuing the protective order in *Cells*, the Trial Court took into account the defense's need to investigate potential government witnesses in Colombia and the United States, as well as the government's concern for witness safety, this Court said. *Id.* at 829, 833. The Judge ordered disclosure of witnesses' real names a short time before their scheduled testimony, and permitted defendants, their lawyers and one additional member of each defense team to receive the names. *Id.* at 833. "The protective order and its management … reflect an appropriate balancing of interests in the relevant case-specific context in view of the factors described in *Alford*[12] and *Smith*[13] as well as *Roviaro*." In short, the Trial Court followed a procedure very similar to the one the Supreme Court enunciated in *Press Enterprise, supra*, and adopted in *Waller, supra*, for balancing a defendant's Sixth Amendment public trial right against competing interests, including the government's interest in confidentiality and witness safety.

---

[12] *Alford v. United States*, 282 U.S. 687 (1931).

[13] *Smith v. Illinois*, 390 U.S. 129 (1968).

**United States v. Cordova, et al. — Page  21**

The case at bar presents a stark contrast. The Trial Court apparently issued a protective order off-the-record some time before the trial began, after the government identified its potential witnesses. The witness list did not include confidential informants or individuals for whom prosecutors sought anonymity.

Before the government called its first witness, there was a very brief discussion regarding the witness list. The prosecutor asked that defense counsel not give their clients the list, and counsel agreed with the caveat that Appellants needed to know the witnesses' names for investigative purposes. Tr. 10/27/10AM, 13 – 14. The discussion ended with the Judge saying,

> I am concerned as the Government has indicated and I should be concerned I think that the lists and transcripts with lists floating around just like yesterday, the jurors — all the documents relating to jury selection I ordered you all to return them so that [the courtroom deputy] could put them in a safe place and that's the end of it. We are not going to have that stuff floating around. We are not going to have it.

*Id.* at 14.

The justifications for the order limiting defendants' access to discovery and its terms can be divined only from on-the-record discussions among the Judge and counsel after Mr. Gutierrez challenged it.

The government's arguments during trial for denying Appellants the transcripts are clear.

> [W]e oppose that for every single reason that we've been submitting to the Court from day one. Particularly with Mr. Gutierrez, a person where we intend to introduce a letter where witnesses are identified, and we intend to prove that he's the one who wrote the letter, and he's the one who wanted to have those people silenced. And it lists witnesses that are on our witness

**United States v. Cordova, et al. — Page 22**

lists.  For these men to have that information back at the D.C. jail, floating around, free rein, from inmate to inmate, is a disaster.[14]

Tr. 11/3/10PM, 62. But in a post-trial hearing the prosecutor said, "we moved for a protective order because we did not want the defendants to be privy to the specific information about witnesses, where they live, what schools they are going to, what jobs they are employed." Tr. 2/6/13, 28.

The letter prosecutors referred to was a document intercepted at the Jail from Mr. Gutierrez to a woman named Liliana. JA **. Written about a year before the government disclosed its witness list, the letter identified the trial prosecutors, the Judge, his codefendants, and several individuals he expected would testify at trial. He asked Liliana "to help me with the Lady of Sivar[15] to silence everyone who is against me." *Id.*

The government steadfastly insisted the letter constituted a threat against listed individuals, and in response, Mr. Gutierrez moved to recuse the Judge. But in a pretrial conference the Judge denied the motion, saying "I have no basis to think whatsoever that any of these defendants in any way — intending or trying in any way to be harmful to this Court or anyone else." Tr. 10/14/10, 50.

The Judge explained his ruling more fully:

The letter, on its face … had a threatening nature to it or quality to it as it related to me and the prosecutors in the case….

… [A]fter a few weeks, [the Marshals] … talked to the person, and were satisfied that the letter was not only very old…, but they believed … the letter was intended in some way, shape or form to be communicated to some kind of … "witch doctor," … down in El Salvador.

---

[14] The Judge ultimately excluded the so-called threat letter. Tr. 11/17/10AM, 17 – 18; JA **.

[15] San Sivar is a neighborhood in San Salvador.

**United States v. Cordova, et al. — Page  23**

> But [] because funds were not available, it was never presented to a witch doctor. And that was the end of it.
>
> And … my sense was that [the Marshals] were satisfied that whatever the threat was, as portrayed by the letter, it wasn't an active, live threat of any kind at that time. And, as a result, no added security was necessary either for me personally or my family or for the … prosecutors….

Tr. 10/18/10, 17 – 18.

In response to a request from Mr. Gutierrez for copies of witness statement, counsel asked the Judge to lift the protective order. He pointed out that Appellants knew the names of government witnesses and had heard several testify. Tr. 11/3/10PM, 60. If Mr. Gutierrez could read the transcripts at the Jail, "the meetings that I have with him can be more productive, move along faster. As opposed to me sitting there, translating each document, he would have a chance to have reviewed those," counsel explained. *Id.*

> He's simply asking that he be allowed to get a copy when he leaves here in the evening of the Jencks material, grand jury testimony, the transcripts … so he could review those, and I meet with him at lunch time, and we could discuss them.

*Id.* at 63.

The Judge denied the motion "for the reasons previously articulated. I don't think it's appropriate under the circumstances." *Id.* The ruling implicitly adopted the government's argument that Mr. Gutierrez, at least, posed a threat to government witnesses. It provides no indication that the Judge considered whether denying Appellants access to Jencks material at the Jail would lessen the perceived security risk. Nor does it indicate that the Judge balanced the government's concerns against Appellants' countervailing Fifth and Sixth amendment rights.

There is no record demonstrating that he gave any thought to means of reducing security concerns in a manner that would have accommodated Appellants' constitutional rights. If the government's real concern was to prevent

**United States v. Cordova, et al. — Page 24**

Appellants from learning where witnesses lived, Jencks material could easily have been sanitized to address that issue. In some multi-defendant RICO cases in this district, judges have arrange for defendants to read discovery documents on computers in the Jail library. That procedure would have given correctional officials control over who had access to the documents. The Judge ordered prosecutors to disclose Jencks material the week before witnesses testified, and could have made the deadline earlier. As noted above, the Judge could have continued appointments of additional counsel after the government elected not to pursue capital punishment.

This Court should view the Judge's unwillingness to re-examine the issue in response to Mr. Gutierrez's motion to amend the protective order as evidence that he failed to conduct the balancing of interests required by the Sixth Amendment. *Press-Enterprise, supra*, at 511.

### The interference with Appellants' ability to defend themselves was not harmless

In this case, as in *Cells*, much of the government's most incriminating testimony came from cooperators well known to Appellants, but virtually unknown to their lawyers. The witnesses would testify because they hoped for leniency from the government and the Court.

As a result, Appellants were in a far better position than their lawyers and investigators to identify instances in which the witnesses lied to the grand jury or government agents, or exhibited bias. But for them, reading the Jencks material was a time-consuming process. By insisting that counsel or defense investigators sit with Appellants as they read Jencks material, the Trial Court made it almost impossible for Appellants to assist in preparing cross-examination.

The deleterious effects of the Trial Court's interference with Appellants' Sixth Amendment rights, at the government's urging, should have been obvious,

**United States v. Cordova, et al. — Page 25**

and therefore were easily preventable. *See Strickland, supra*, at 692 (citing *United States v. Cronic*, 466 U.S. 648, 659 & n. 25 (1984)). Because Appellants' Sixth Amendment rights far outweighed the speculative security benefits derived in this case from the protective order, and because the government cannot demonstrate beyond a reasonable doubt that the error was harmless, Appellants are entitled to a new trial.

### THE JUDGE'S REFUSAL TO RECUSE HIMSELF DEPRIVED APPELLANTS OF THEIR SIXTH AMENDMENT RIGHT TO BE TRIED BEFORE AN IMPARTIAL TRIBUNAL

About a year before trial, corrections officers at the D.C. Jail found a letter apparently written by Mr. Gutierrez to a female acquaintance. JA **. The government regarded the letter as a threat to harm the Judge, trial prosecutors and several potential witnesses.

In an off-the-record conversation October 13, 2010, before a pretrial conference began, Mr. Gutierrez's counsel asked the Judge to recuse himself.

Although he had previously found that Appellants were so dangerous that they should not have copies of the discovery material, see above, the Judge denied the request. Immediately before trial the Judge said he viewed Mr. Gutierrez's letter as a request for help from a "witch doctor" in El Salvador, not as a threat against anyone involved in the trial. Tr. 10/18/10, 17 – 18.

But events that unfolded after an investigator gave Jencks material to Mr. Sorto at the D.C. Jail would have caused a reasonable observer to question the Judge's ability to remain neutral. Therefore, Appellants are entitled to a new trial.

### *Standard of review*

A litigant may seek recusal of a judge "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Applying an objective standard, recusal is required when "a reasonable and informed observer

**United States v. Cordova, et al. — Page 26**

would question the judge's impartiality." *S.E.C. v. Loving Spirit Foundation, Inc.*, 392 F.3$^d$ 486, 494 (D.C. Cir., 2004)(*citing United States v. Microsoft Corp.,* 253 F.3$^d$ 34, 114 (D.C. Cir.2001)(*en banc*)(*per curiam*)).

A party requesting recusal is not required to demonstrate conscious bias. Under § 455, all that is required is a showing that a reasonable person might perceive the current circumstance as one in which the judicial officer is imbued with bias, prejudice or partiality. S*ao Paulo v. Am. Tobacco Co*., 535 U.S. 229, 233 (2002).

However, this Circuit has never articulated the standard by which it will review denial of a § 455(a) motion to recuse a judge. Most circuits that have addressed the issue review for abuse of discretion. *Loving, supra*, at 493. *See, e.g., Jones v. Pittsburgh Nat'l Corp.,* 899 F.2$^d$ 1350, 1356 (3$^d$ Cir.1990); *United States v. Owens,* 902 F.2$^d$ 1154, 1157 & n. 2 (4th Cir.1990). Others review *de novo*. *See, e.g., United States v. Sykes,* 7 F.3$^d$ 1331, 1339 (7th Cir.1993).

### An objectively reasonable observer would have questioned the Judge's impartiality

Due process demands that a judge possess neither actual nor apparent bias. The concept, codified in § 455(a), requires recusal if a judge's impartiality may reasonably be questioned. *See, e.g., Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 62 (1972); S*ao Paulo, supra*.

In this case, the U.S. Marshals investigated the letter, determined that Mr. Gutierrez wrote it, and interviewed Lilliana, the woman to whom it was addressed. Investigators concluded that references to silencing the Judge, prosecutors, codefendants and potential witnesses were directed to a shaman in El Salvador, the Lady of Sivar, not threats to harm identified individuals.

**United States v. Cordova, et al. — Page  27**

Nonetheless, the government insisted the letter was directed against them, and that the reference to the Lady of Sivar was a code directed to MS headquarters in El Salvador.

Shortly before trial the Judge made findings on the record about the Marshals' inquiry and stated that he interpreted the letter as a plea for assistance from a  shaman, that was not delivered because Mr. Gutierrez could not afford the shaman's services. Because he did not perceive the letter as a threat, the Judge said he would not recuse himself. In addition he refused to order heightened security in the courtroom or to bar MS-13 members from attending the trial.

 After the Judge denied the recusal motion, the following colloquy occurred.

[SECOND PROSECUTOR]: … I am [] reluctant to go back to the recusal issue, but I do think that's necessary just for appeal purposes, if we should get there, to make a few things clear on the record because … when we filed our opposition, we couldn't represent what your Honor knew. I would ask the Court … to say on the record whether, as we represented at page 5 of our opposition…, that the Marshals conveyed … both interpretations of this letter to you. One is sort of the more sinister, threatening letter. And the other is sort of a call for a witch doctor to put a curse on certain people.

…

THE COURT: Well, I could give you … my best recollection of the situation.

[SECOND PROSECUTOR]: That would be appreciated…. [T]he Court has made clear that it did not think that additional security was necessary in the courtroom for this trial. And [] I don't want to make this personal …, but I don't believe the Court has asked for additional security yet at your Honor's home.

THE COURT:  I have not.

…

[MR. GUTIERREZ'S COUNSEL]: … [W]ith respect to the letters that you received from the Marshals Service, I think that those letters could

**United States v. Cordova, et al. — Page  28**

be introduced if an appeal is necessary. I don't know that the Court needs to actually recite on the record what the letters said.

And the interpretation by the Marshal as to whether or not it called for either some kind of physical action or whether or not it was calling for some kind of magical action is an interpretation by the Marshal. And I really don't think that the Court should be trying to divine exactly what was in the head of the Marshal or in the head of the author of the letter. I think it suffices to say that, at this time anyway, the Court doesn't feel the need for additional security. And I don't know why we need to develop the record further.

THE COURT:  Well, let me state very briefly and very succinctly the following. And I think this will resolve — it's not a dispute, really, but difference approach. When I was first approached by the Marshals that they had found … the letter, of course, was undated. It was in Spanish. They weren't 100 percent sure who it was from. And they hadn't located the person who they thought it was to. So they hadn't had a chance to talk to that person. And they were looking for that person.

The letter, on its face — again, not being completely sure who it was from — had a threatening nature to it or quality to it as it related to me and the prosecutors in the case. But the initial sense was, well, we have got to talk to the person who it's to and verify … where it's from, et cetera.

…

[MR. GUTIERREZ'S COUNSEL]: I appreciate what the Court has said, but Mr. Gutierrez's concern is … not just what was in your mind with respect to being made aware of the letter, but also the appearance of impropriety, what is the public perception when they know that a Judge has received something that has been determined by the United States Marshal Service to be threatening, be it from a supernatural source or be it from, you know, a very worldly source. So that was the second part of the Motion for recusal, and I don't believe that the Court has really addressed that.

THE COURT: Well, I can't predict what the public's perception is going to be. First of all, I am not even sure it's going to be introduced into evidence or offered into evidence, so the public might never know of it. That's a decision the Government is going to have to make as to whether to offer it. I will have to make a decision whether to permit it.

Tr. 10/18/10, 15 – 19.

**United States v. Cordova, et al. — Page  29**

The judge was focused on the jury's perception. Defense counsel was focused on the larger community of potential observers.

When Appellants' access to Jencks material became an issue again in the second week of the trial, the degree to which the Trial Court had misjudged its ability to remain impartial became apparent. Before the Court convened November 4, a Marshal tried to give a note written by Hector Hernandez-Melendez to one of the prosecutors. Tr. 11/4/10AM, 3. Hernandez-Melendez was a cooperator who had been on the stand since November 2 and was under cross-examination. Without reading the note, the prosecutor informed the Court.

The Judge immediately expressed concern that the witness might have been threatened. *Id.* at 5 – 6.

> My concern with regard to this note is heightened by what we learned yesterday in terms of certain discovery materials being brought to and from the jail and not being in a position to know for certain … whether any portion of them had been Xeroxed or left behind which, of course, we are in the process of trying to determine right now….

*Id.* at 7.

The Judge held a conference call with counsel about 90 minutes later, after an interpreter translated the note. The note was a request to remain at the Correctional Treatment Facility after Hernandez-Melendez finished testifying. Tr. 11/4/10 Conf. Call, 3.

The letter again became an issue late in the prosecution case, when the government sought to call the woman to whom it was addressed and to put it in evidence. Tr. 11/16/10AM, 89 – 96. Ultimately, the government argued that the letter was admissible only against Mr. Gutierrez and that the threats showed consciousness of guilt. Tr. 11/17/10AM, 5 – 6.

That led to the following discussion:

**United States v. Cordova, et al. — Page 30**

THE COURT: Well, the letter really isn't very clear on its face as to what exactly … he is asking on the face of the letter, he seems to be asking this person, Lilliana, to come and see him because he wants to discuss things with her and then he kind of adds at [the] end another thing I would like you to help me with this person, Lady of Sivar, I don't know who that person is obviously, but there seems to be some information out there that this person is some kind of a witch doctor.

I don't know if she is or she isn't, and I don't know to what extent Lilliana is witting as to whether she is or she isn't. [Defense counsel] … made some comment to the effect that this could be interpreted to be a green light. If this letter got into the possession of the wrong hands of people in El Salvador, this could be viewed as some kind of a green light for people in MS in El Salvador to be energized or empowered in some way to act out the wishes that [are] reflected in this letter.

You know, I don't know where that would take me, but on its face, it is confusing in the sense that it [] appears to be giving a list of people he wants silenced that include his fellow Defendants.

Tr. 11/17/10AM, 7 – 8.

While there may have been uncertainty on the part of the Court about Mr. Gutierrez's intentions, there was no doubt that the government viewed the letter as a request to someone in El Salvador to order a "shot."

[SECOND PROSECUTOR]: … I will be candid with the Court … that our expert witness would … indicate that this was actually a more serious threat, whatever the level of the threat whether it is a curse against the people against him or a request for action, more violent action against … them, in our view, that's still consciousness of guilt….

To the letter itself, the way I had interpreted it, … and I confess I am speaking only for me here, the letter says … ["]I would like you to help me with the Lady of Sivar to silence everyone against me.["] I believe [First Prosecutor] has explained to the Court that our expert witness would testify that the Lady of Sivar is actually some sort of MS-13 headquarters in El Salvador.

Then it says the names of the prosecutors, the name of your Honor, those who are companions in my case and lists the codefendants in this case.

**United States v. Cordova, et al. — Page 31**

Then in the last heading is possible testimony where it lists Misael Esquina-Flores, Nelson Maldonado…, Feliciana Flores, Thomas Perez. The last line says: ["]These are the possible testimonies that will be against me but keep them in your prayers.["]

…

THE COURT: And Lady of Sivar [] is some kind of a code name for an MS-13 organization in El Salvador?

…

[FIRST PROSECUTOR]: … The expert that we have shown this letter to, and we showed it to two experts, in particular one directly from El Salvador … who would be testifying this morning interpret the Lady of Sivar to be a possible what they call a shot call or a person who has a La Palabra in El Salvador who can authorize killings of witnesses or attacks on witnesses as well.

*Id.* at 9 – 12.

Considering the discussion above, on-the-record discussions related to the protective order, the restrictions imposed in service of maintaining "security" on Appellants' note-taking as a means of communicating with defense counsel, and the Judge's comments at a hearing two years after trial,[16] a reasonable observer

---

[16] In a hearing on Mr. Sorto's motion to reconstruct the record of a 2¼-hour *in camera*, off-the-record discussion of jury instructions, the Judge said:

Are you familiar with the record as it relates to Jencks material being in the jail cell of your client?

…

Are you familiar with a threat to the Court and to file prosecutors in this case that was … found in the jail cell of one of these defendants?

…

Are you familiar with other items that were found in that same jail cell that posed a threat to not only the Court but to other members of the prison, people staying in other parts of the prison? Do you have familiarity with that?

…

Continued on next page …

**United States v. Cordova, et al. — Page  32**

would have questioned the Trial Court's impartiality. Its failure to reconsider recusal violated the spirit, if not the requirements of § 455(a).

In a case where a defendant was charged with conspiring to blow up a federal courthouse, the Seventh Circuit issued a *mandamus* requiring the District Judge to recuse himself. *In re Nettles*, 394 F.3$^d$ 1001 (7th Cir. 2005). The appellate court followed that order by recusing itself from further proceedings. *Id.* at 1002 – 3. Although the *Nettles* Court did not suggest that either the District Judge or the Court of Appeals was biased, it correctly concluded that a reasonable observer "would think that a judge who works in the Dirksen building would want Nettles to be convicted and given a long sentence." *Id.* at 1003.

Several circuits have held that doubts about the impartiality of a judge should be resolved in favor of recusal. *See, e.g., United States v. Pulido*, 566 F.3$^d$ 52, 62 (1st Cir. 2009)(when question of § 455(a) disqualification is close, balance tips in favor of recusal); *United States v. Holland*, 519 F.3$^d$ 909, 912 (9th Cir. 2008); *United States v. Patti*, 337 F.3$^d$ 1317, 1321 (11th Cir. 2003); *United States v. Dandy*,  998 F.2$^d$ 1344, 1349 (6th Cir. 1993). *Cf. United States v. Mosby*, 177 F.3$^d$ 1067, 1069 (8th Cir. 1999).

In the case at bar, there is ample evidence from which an objectively reasonable observer could conclude that the Judge was biased. Therefore, the Trial Court abused its discretion by deciding that it could preside over Appellants' trial.

---

… Continued from previous page.

You need to familiarize yourself with those issues. I think when you familiarize yourself with those issues you might have a heightened appreciation why there may be some security issues that may have warranted from time to time discussions that had nothing to do with the trial in this case.

Tr. 12/13/10, 18 – 19.

**United States v. Cordova, et al. — Page  33**

*See*, *In re Murchison*, 349 U.S. 133, 136 (1955)(to perform its high function in the best way "justice must satisfy the appearance of justice").

The error denied Appellants the right to due process and a fair trial as contemplated under the Fifth and Sixth amendments.

### AN OFF-THE-RECORD, *IN-CAMERA* DISCUSSION OF FINAL JURY INSTRUCTIONS VIOLATED APPELLANTS' TRIAL AND APPELLATE RIGHTS

The Judge held an *in camera*, off-the-record meeting with counsel November 29, 2010 for over two hours to discuss jury instructions. Tr. 11/29/10, 3. The transcript of proceedings that day states:

(10:31 a.m.)

THE COURT:  Off the record.

(Thereupon, a discussion was had off the record between Court and counsel from 10:31 a.m. until 12:45 p.m.)

(Thereupon, a luncheon recess was had beginning at 12:45 p.m.)

Tr. 11/29/10, 3.

The Judge did not state the purpose of the ensuing proceeding, why it would not be held in open court, why it would be off-the-record, and he did not ask whether defense counsel would waive their clients' presence or their Sixth Amendment right to a public trial. *See Waller, supra.*

When Court reconvened that afternoon, the Judge said,

For the record, this morning the Court met with the attorneys in the case off the record to review the latest draft of the instructions and to determine which, if any of them, required oral argument because of differences of opinion between the government and the defense with regard to the content of the instructions as currently constructed.

*Id.* at 4. He added that many instructions were non-controversial, but that "there was a fairly sizable list of potential instructions that do warrant some follow-up

**United States v. Cordova, et al. — Page  34**

discussion and advocacy on the record…." *Id.* The Judge summarized 2¼ hours of discussion in three paragraphs.

After reading the trial transcripts, Mr. Sorto's appellate counsel moved, pursuant to Fed. R. App. P. 10, to reconstruct the record of the *in camera* proceeding. JA \*\*. The Judge held two hearings on the motion, the first December 13, 2012 attended by prosecutors and Mr. Sorto's trial and appellate counsel, the second February 6, 2013 attended by all trial counsel and Mr. Sorto's appellate counsel. The two hearings yielded an explanation of the Trial Court's practice, but no more detail about the substance of the off-the-record hearing.

The November 29, 2010 proceeding underlies two related issues in this appeal. By excluding Appellants from the discussion, the Trial Court deprived them of their Fifth Amendment right to due process. By holding that discussion off-the-record, it prejudicially impaired their Sixth Amendment right to effective appellate representation, as well as their due process right. *See, e.g., Evitts v. Lucey*, 469 U.S. 387, 396 – 7 (1985); *Douglas v. California*, 372 U.S. 353, 356 – 7 (1963).

### *Standard of review*

From the record, defense counsel appears to have acquiesced in the decisions to exclude Appellants and discuss the jury instructions off-the-record. Under most circumstances, when counsel fails to object, this Court reviews for plain error. *See United States v. Hoover-Hankerson*, 511 F.3[d] 164, 169 (D.C. Cir. 2007).

For reasons stated below, counsel could not waive their clients' presence, and under these circumstances the Trial Court could not have interpreted defense counsel's acquiescence as indicating Appellants' knowing, intelligent waivers.

Therefore, the Court should apply the more stringent harmless error

**United States v. Cordova, et al. — Page  35**

standard. In this case the errors impinged on Appellants' Fifth and Sixth

amendment rights, and this Court should reverse Appellants convictions unless the

government can demonstrate that the error was harmless beyond a reasonable

doubt. *Chapman, supra*. *See, also, Sullivan v. Louisiana,* 508 U.S. 275, 279

(1993); *United States v. Cunningham*, 145 F.3[d] 1385, 1394 (D.C. Cir. 1998).

### *Appellants' Constitutional Rights Were Violated*

A criminal defendant's constitutional right to be present at various stages of

his trial is rooted in the Confrontation Clause of the Sixth Amendment, and when

confrontation is not at issue, the Due Process Clause of the Fifth Amendment. *See*

*United States v. Gagnon,* 470 U.S. 522, 526 (1985). In *Hopt v. Utah*, 110 U.S. 574,

578 (1884), the Supreme Court held that a criminal defendant had the right to be

present when the trial court rules on challenges of jurors for bias, because the

necessities of the defense may not be met by the presence of counsel alone. This

decision acknowledged that a defendant's absence raises a question of

constitutional dimension.

Then, in *Snyder, supra*, 291 U.S. at 106 – 7, the Court narrowed *Hopt*,

saying a defendant need not be present "when presence would be useless, or the

benefit but a shadow." It reiterated that a criminal defendant has a due process

right to be in court when his presence "bears, or may fairly be assumed to bear, a

relation, reasonably substantial, to his opportunity to defend."

This Circuit has addressed whether a defendant has a constitutional right to

be present when a jury returns for reinstruction. *See Wade v. United States*, 441

F.2[d] 1046, 1049 (D.C. 1971). But it has not addressed a defendant's right to be

present before deliberations begin when jury instructions are discussed.

In this case, Appellants' presence would not have been useless. As in *Hopt*,

they had a right to hear and consult with counsel during discussion of the jury

**United States v. Cordova, et al. — Page  36**

instructions because those instructions had a direct bearing on their defense. As noted above at 19, a criminal defendant is an active participant in his defense, not merely a passive beneficiary of the defense his counsel presents. *Faretta, supra.*

### Appellants Had a Right to be Present Pursuant to Fed. R. Crim. P. 43

Generally, a criminal defendant must be present at "every trial stage." Rule 43(a)(2). Rule 43(b)(3) makes an exception for instances where "[t]he proceeding involves only a conference or hearing on a question of law." In effect, the rule codifies the defendant's Fifth and Sixth amendment rights.

This Court held in *Wade, supra*, at 1050, that the rule required a defendant to be present when the District Court reinstructed jurors, even though counsel waived his presence saying it would serve no purpose. It mattered not that the defendant was unable to articulate a reason he needed to be in court or identify prejudice he suffered from being excluded, the Court held. The "standard by which to determine whether reversible error occurred [] is not whether the accused was actually prejudiced, but whether there is any reasonable possibility of prejudice." *Id.* It added,

> [t]o hold his absence harmless would be too speculative. It would assume to reconstruct what might have eventuated had he been present, when that cannot truly be reconstructed with a degree of certainty essential to avoid the reasonable possibility of prejudice.

*Id.* at 1051.

If a defendant has the constitutional and rule-based right to be present when counsel and the Judge discuss how to respond to a jury note and when jurors are reinstructed, there was no principled reason for excluding these Appellants when their lawyers and the Trial Court discussed instructions to be given to their jury.

In *Rogers v. United States*, 422 U.S. 35 (1975), the Supreme Court reversed

**United States v. Cordova, et al. — Page 37**

the defendant's conviction because he was not present when the Trial Court responded to a jury inquiry about what would occur if it returned a verdict of guilty "with extreme mercy of the Court." The Supreme Court acknowledged that a Rule 43 violation may sometimes be harmless, but concluded that Rogers was prejudiced because the trial judge at least should have informed the jury that its recommendation would not be binding and admonished to render a verdict without regard to what the sentence might be. *Id.*

As a result of the Supreme Court's decision in *Rogers*, the Fourth Circuit determined, "Our pre-*Rogers* precedent ... which hold that the defendant has no right to be present at an in-chambers discussion on jury instructions, have been implicitly overruled by the Supreme Court's holding in *Rogers.*" *United States v. Rhodes*, 32 F.3$^d$ 867, 873 (4th Cir. 1994). The Court did not find, however, that the error affected his substantial rights under the facts of the case.

This Court must determine whether Appellants have established plain error.

### Appellants did not waive their presence

There is a presumption against waiver of constitutional rights. *See, e.g., Glasser v. United States*, 315 U.S. 60, 70 – 71 (1942). Before a waiver is deemed to be effective, a court must determine that there was "an intentional relinquishment or abandonment of a known right or privilege." *Brookhart v. Janis*, 384 U.S. 1, 4 (1966); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Any waiver must be made by the defendant and not through counsel. *United States v. Gordon*, 829 F.2$^d$ 119, 125 (D.C. Cir. 1987), held that,

> [i]n applying this rule … it is clear that rather than permitting defense counsel to waive [defendant's] right to presence, the court should have held an on-the-record hearing to advise [him] of his right to be present ... and obtained a personal waiver in open court. The slight additional burden on the criminal justice process wrought by a personal waiver requirement is more than offset by avoidance of lengthy appeals to determine whether the

**United States v. Cordova, et al. — Page  38**

defendant's right to presence has been violated.

In this case, Appellants had a constitutional right to be present during discussion of final jury instructions. Yet, they were not informed of this. Thus, Appellants were excluded from the jury instruction discussion without being told what would transpire, without being informed of their right to be present, and without being asked whether they would waive their presence. The *in camera*, off-the-record discussion violated the Fifth and Sixth amendments, and Rule 43.

### Failure to create a record deprived Appellants of effective representation in this Court

In the first Rule 10 hearing the Trial Court explained his procedure for preparing jury instructions.

> [W]e sit down with the lawyers, off the record, and go over the instructions that have been proposed to see where there are any disagreements, and then identify where the disagreements are. Once we've identified them, we go on the record with the parties present because otherwise why waste their time listening to a bunch of lawyers talk about where there may be disagreements on instructions, and then we go on the record and we have whatever discussion we need to have and differences of opinion aired, and citations to authorities given, and Redbook authorities, et cetera, et cetera, and proposed alternative language, et cetera, et cetera.
>
> …
>
> … I want the record to be as accurate as possible as to what occurred. I described on the record … the next time we convened, … what we had been doing and what we were going to do next. That's a contemporaneous record of what occurred.

Tr. 12/13/12, 3 – 4. The Judge did not explain why holding the discussion without a court reporter present was more efficient, whose time would have been wasted if the discussion took place in open court, or why he neither informed Appellants of the purpose of the hearing nor asked whether they would waive their presence.

The fact that counsel had an opportunity later to put objections on the record

**United States v. Cordova, et al. — Page 39**

in open court is not an adequate substitute because it is unlikely that every improvement they suggested or objection they raised to instructions ultimately given made it into the on-the-record proceeding.

Asked two years after the trial for his recollection of the discussion, the prosecutor responded,

> [o]ur trial file in this case is about 22 boxes. … [W]e went through them and … [we] really have [no] notes pertaining to that meeting. As I recall it though, Your Honor gave us … the initial draft of the instruction.
>
> …
>
> The government's initial proposed instructions were 92 pages.
>
> …
>
> Mr. Gutierrez had some 50 pages of instructions. Mr. Sorto, through Mr. Seltzer, had about 64 pages of instructions…. I don't think I took any notes … — like we just went through [] Instruction Number 1. Does anybody have an objection? No. And I would, at the most, flagged it or not flagged it. And then we came in and went through the extensive arguments that we had about the instructions.

*Id.* at 4 – 5. Mr. Sorto's trial counsel said,

> I don't have a recollection much different. … I do not have specific detailed notes about what happened with each instruction, but, in general, my recollection was we did go over the jury instructions and agreed that whatever ones were not agreed on, we'd come out and do it in open court.

*Id.* at 7 – 8. Counsel for Mr. Cordova and Mr. Gutierrez provided little additional detail. Tr. 2/6/13,  24 – 25.

Under the circumstances of this case, the Trial Court's exclusion of Appellants from discussion of jury instructions without first obtaining knowing, intelligent waivers, and failure to create an accurate record of the discussion violated the Fifth and Sixth amendments. Reversal is required unless the government can demonstrate beyond a reasonable doubt that the errors were

**United States v. Cordova, et al. — Page  40**

harmless.

### THE INDICTMENT BLOATED WITH MULTIPLICITOUS SUBSTANTIVE CHARGES WAS HIGHLY PREJUDICIAL

The 22-page, 19-count Indictment included substantive offenses in the District of Columbia arising from three violent crimes, the murder of Edward Ventura and wounding of Nilson Maldonado April 22, 2007, and the wounding of Feliciana Esquina-Flores June 1, 2007. These violent crimes each gave rise to four or more substantive violations of federal and D.C. law. The combination of §1959(a) substantive counts and §924(c) counts with parallel D.C. Code violations in charging a homicide and one of the assaults greatly increased the prejudice to Appellants by significantly increasing the total number of counts.

In connection with the homicide the government charged Appellants under §1959(a)(1) with VICAR murder and under D.C. Code §§22-2101 and 22-4502 with first-degree premeditated murder while armed. The Trial Court instructed jurors that to convict Appellants under §1959(a) for murder in aid or racketeering they had to find beyond a reasonable doubt that they committed first-degree premeditated murder under D.C. law. Tr. 12/1/10AM, 70 – 1. *See, e.g., United States v. Carillo*, 229 F.3$^d$ 177, 183 – 4 (2$^d$ Cir. 2000). The Judge read Instruction 4.17, CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, 4th Ed. 1993, 1996. Tr. 12/1/10AM, 74 – 6.

In connection with the simultaneous wounding of Maldonado, the charges under § 1959(a)(3) were VICAR assault with a dangerous weapon and under §§ 22-401 and 22-4502 were assault with intent to kill while armed. Here, too, the Judge instructed that jurors had to find all elements of the D.C. offenses to convict Appellants of the VICAR offense. Tr. 12/1/10AM, 71 – 2.

In relation to the April 22 homicide and assault, each defendant was charged with two § 924(c) counts and one D.C. Code § 22-4504 count. Although

**United States v. Cordova, et al. — Page  41**

Appellants could be convicted under § 924(c), even if they were acquitted of the related VICAR charges,[17] § 22-4504(a) is a sentence enhancement applying only in conjunction with conviction on the underlying charge.[18]

As a result of the assault on Feliciana Esquina-Flores, the government charged Mr. Cordova and Mr. Gutierrez under § 1959(a)(2) with VICAR maiming and under § 22-401 and 22-4502 with assault with intent to kill while armed. But here, the Judge told jurors that an essential element of the VICAR offense was a finding beyond a reasonable doubt that Appellants committed maiming in violation of D.C. Code § 22-406, not assault with intent to kill. Tr. 12/1/10AM, 79 – 80, 83 – 4. In addition, the Indictment charge Mr. Cordova and Mr. Gutierrez with two § 924(c) counts related to VICAR maiming and VICAR threats, and one § 22-4504(b) count related to the D.C. assault charge.

### *Standard of review*

Under ordinary circumstances a defendant must lodge objections to the indictment before trial. Fed. R. Crim. P. 12(b)(3)(B). Failure to object before trial to multiplicitous charges constitutes waiver. *See United States v. Weathers (Weathers I)*, 186 F.3$^d$ 948, 958 (D.C. Cir. 1999).

But this case presents a multiplicity problem that is far from ordinary because it can occur nowhere in the United States besides the District of Columbia. It arises from the unique jurisdiction of the U.S. District Court here to prosecute D.C. Code and federal offenses arising from the same event. *See, e.g., United*

---

[17] *United States v. Anderson*, 59 F.3$^d$ 1323, 1326 (D.C. Cir. 1995).

[18] *Thomas v. United States*, 602 A.2$^d$ 647, 650 (D.C. 1992). Appellants will argue below that each can be convicted of only one count under § 924(c) arising from the homicide and assault that were part of the April 22 incident and one § 924(c) count arising from the Feliciana Esquina-Flores assault June 1. *Anderson, supra*.

**United States v. Cordova, et al. — Page  42**

*States v. Sumler*, 136 F.3[d] 188, 198 – 9 (D.C. Cir. 1998).

In dealing with VICAR offenses, the underlying D.C. Code homicide and assault effectively become lesser-included offenses, which do not raise double-jeopardy concerns until the Judge gives final jury instructions. Therefore, Appellants could not have challenged inclusion of the D.C. violent crimes and related firearms charges pretrial.

As a result, the Court should review for constitutional trial error, reversing Appellants' convictions arising from the Ventura homicide and Maldonado assault unless the government can demonstrate beyond a reasonable doubt that the multiplicitous counts had no effect on the verdict.[19] *Chapman, supra.*

### *Inclusion of D.C. Code offenses violated the Fifth Amendment*

An indictment is multiplicitous if it charges a single offense in more than one count. *See, e.g., United States v. Langford*, 946 F.2[d] 798, 802 (11th Cir. 1991). The most recognized danger posed by a multiplicitous indictment is that the defendant will receive multiple punishments for the same crime.[20] *United States v. Carter*, 576 F.2[d] 1061, 1064 (3[d] Cir. 1978). Another significant danger, particularly

---

[19] Relying on Fed. R. Crim. P. 12(b)(2) and 12(f), this Court held in *Weathers I, supra*, at 958, that failure to object to a multiplicitous indictment pretrial waives the double jeopardy claim. In 2002 the rule was amended, and the requirement that objections to the indictment be filed pretrial became Rule 12(b)(3). The waiver provision was moved to Rule 12(e) and was amended to permit "relief from the waiver" for good cause. *United States v. Hemphill*, 514 F.3[d] 1350, 1365 (D.C. Cir. 2008). For reasons discussed below at 52 – 54, the Court should find that the waiver provision does not apply in this case.

[20] Because the jury convicted Appellants of the VICAR counts and the multiplicitous D.C. charges and the Judge imposed sentence on all counts of conviction, this case must be remanded for resentencing, even if the Court rules that the indictment was not prejudicially multiplicitous. See below at 54 – 56.

when the indictment includes several duplicative charges, is that the multiplicity
"may improperly prejudice a jury by suggesting that a defendant has committed
several crimes — not one." *Langford, supra. See, also, United States v. Marquardt*,
786 F.2$^d$ 771, 778 (7th Cir. 1986); *United States v. Reed*, 639 F.2$^d$ 896, 904 (2$^d$ Cir.
1981). Justice Marshall, dissenting in *Missouri v. Hunter*, 459 U.S. 359, 370 – 2
(1983), said,

> If the prohibition against being "twice put in jeopardy" for "the same
> offence" is to have any real meaning, a State cannot be allowed to convict a
> defendant two, three, or more times simply by enacting separate statutory
> provisions defining nominally distinct crimes. …
>
> When multiple charges are brought, the defendant is "put in jeopardy"
> as to each charge. To retain his freedom, the defendant must obtain an
> acquittal on all charges; to put the defendant in prison, the prosecution need
> only obtain a single guilty verdict…. The very fact that a defendant has been
> arrested, charged, and brought to trial on several charges may suggest to the
> jury that he must be guilty of at least one of those crimes.

*See, also, Ball v. United States*, 470 U.S. 856, 867 (1985)(Stevens, J., concurring in
judgment).

The prejudicial error in Appellants' case arose because of the unique
jurisdictional relationship Congress created between the District of Columbia and
the federal government. D.C. Code §11-502. This Court recognized in *United
States v. Sheperd*, 513 F.2$^d$ 1324, 1333 (D.C. Cir. 1975), that, as a general
proposition, the government may try a defendant for violation of federal and D.C.
statutes that arise from the same transaction. But this Court has held that the
"separate sovereign" doctrine does not apply here because Congress enacted the
D.C. Code and "the double jeopardy clause clearly bars overlapping
prosecutions…." *United States v. Canty*, 469 F.2$^d$ 114, 128 (D.C. Cir. 1972).
*Sheperd, supra*, at 1331 – 2, recognized that "the *double jeopardy clause of the
fifth amendment* will bar separate prosecutions under the federal and D.C. statutes

**United States v. Cordova, et al. — Page  44**

… where the offenses are identical or where one offense is a lesser included offense of the other." (emphasis in original, footnote omitted).

In no other jurisdiction could the U.S. Attorney prosecute a defendant for the state predicate crimes along with the VICAR counts. 18 U.S.C. §3231. In fact, Congress enacted §1959 in large measure to make it possible for the Justice Department to prosecute under federal law where there have been "violations of State law, but local law enforcement officials are unlikely or unable to successfully prosecute the case." U.S. Attorney's Manual, § 9-110.310. When it enacted the VICAR statute Congress did not envision doubling the charges by indicting defendants for federal violent crimes and parallel, if not identical, state predicate offenses.

When it enacted the Comprehensive Crime Control Act of 1983, Congress was "aware of the concerns of local prosecutors with respect to the creation of concurrent Federal jurisdiction in an area, namely murder cases, which has heretofore been the almost exclusive responsibility of State and local authorities." S. Rep. 98-225, Report of the Committee on the Judiciary, United States Senate on S. 1762, 304, 98th Cong., 1st Sess.

> [T]he option of Federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of [] value, and the proper Federal nexus … is present. This does not mean, nor does the Committee intend, that all or even most such offenses should become matters of Federal responsibility. [] Federal jurisdiction should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved and the relative ability of the Federal and State authorities to investigate and prosecute….
>
> … Federal jurisdiction is clear, in view of the Federal Government's strong interest, as recognized in existing statutes, in suppressing the activities of organized criminal enterprises, and the fact that the FBI's experience and network of informants and intelligence with respect to such enterprises will often facilitate a successful Federal investigation where local

**United States v. Cordova, et al. — Page  45**

> authorities might be stymied. Here, again, [] the Committee does not intend that all such offenses should be prosecuted federally. Murder, kidnapping and assault also violate State law and the State will still have an important role to play in many such cases that are committed as an integral part of an organized operation.

*Id.* at 305. Congress anticipated that federal authorities would act where a state lacked the resources or political will to win convictions, or would engage in cooperative investigations where a state was able to convict offenders. It did not intend to create a regime under which defendants would face separate prosecutions of VICAR offenses and predicate state crimes, and it did not anticipate that § 1959 put defendants at risk of being prosecuted at both levels for the same crimes.

This Court expressed concern about this unequal treatment of D.C. defendants in *United States v. Knight*, 509 F.2$^d$ 354 (D.C. Cir. 1974), but changed its position in *United States v. Jones*, 527 F.2$^d$ 817, 821 (D.C. Cir. 1975). It said D.C. defendants get a benefit when tried for D.C. and federal offenses together because, unlike defendants prosecuted separately for identical federal and state offenses, they cannot be sentenced cumulatively where the two crimes fail the *Blockburger*[21] test. *Sumler, supra*, at 191.

This Court has recognized two circumstances where the reasoning of *Jones* and *Sumler* does not apply: "where the federal offense and local offense are identical or one would be a lesser included offense of the other." *Jones, supra*, at 821, *Sumler, supra*, at 192.

There is no question that first-degree premeditated murder while armed is a lesser-included offense of VICAR murder and assault with intent to kill while armed is a lesser included offense of VICAR assault with a dangerous weapon. As the Judge instructed jurors, to satisfy the second element of VICAR murder they

---

[21] Blockburger v. United States, 282 U.S. 299 (1932).

**United States v. Cordova, et al. — Page  46**

would have to find beyond a reasonable doubt that Appellants violated §§ 22-2101 and 22-4502, and to satisfy the second element of VICAR assault they would have to find violations of §§ 22-401 and 22-4502.

This Court agreed in *United States v. Mahdi*, 598 F.3$^d$ 883, 888 (D.C. Cir. 2010). But it chose to disregard its prior holdings in *Canty* and *Jones*, and the results of the *Blockburger* test, which it characterized as "a canon of construction, not a 'conclusive presumption of law.' " *Mahdi, supra* (*quoting Garrett v. United States*, 471 U.S. 773, 779 (1985)).

This Court's error was in reading only part of *Garrett's* holding. Relying on *Hunter, supra*, the *Garrett* Court said, "the *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history." Nothing in *Garrett* undermined this Court's earlier holding in *Sheperd, supra*. Under *Jones, supra*, and *Sumler, supra*, when a crime under the D.C. Code is a lesser-included offense of a crime under the U.S. Code, a defendant cannot be convicted of both unless Congress clearly expressed its intention to permit double punishment.

The *Mahdi* Court recognized that nothing in the wording of § 1959(a) established Congress's intent to authorize punishment for a VICAR offense and the lesser-included D.C. violent crime. It could point to nothing in the legislative history supporting a conclusion that Congress anticipated, much less that it clearly intended to create a situation where a defendant would face federal prosecution for a VICAR offense and state prosecution for the predicate violent crime arising from the same events.

So the Court chose to abandon Supreme Court and its own precedent and draw an analogy to the Continuing Criminal Enterprise statute. 21 U.S.C. § 848. CCE is an entirely unrelated statute that unambiguously provides an additional penalty for a substantive offense when the perpetrator is a leader of a drug-

**United States v. Cordova, et al. — Page  47**

trafficking organization. Based on a plain reading of the statute, the Supreme Court said, Congress's "intent to create a separate offense could hardly be clearer," and the legislative history supported that conclusion. *Garrett, supra*, at 782 – 5.

Next, the *Mahdi* Court drew an analogy to the relationship between RICO conspiracy under 18 U.S.C. § 1961, *et seq.*, and narcotics conspiracy under 21 U.S.C. § 846. Stating that "RICO is intended to supplement, rather than replace, existing criminal provisions and … although the drug conspiracy is a lesser included offense of the RICO conspiracy, cumulative punishments are authorized." *Mahdi, supra*, at 889 (*quoting United States v. White*, 116 F.3[d] 903, 932 (D.C. Cir. 1997)).

> The Court held in *White* that

> [t]he RICO statute [] provides that "nothing in [RICO] shall supersede any provision of Federal … law imposing criminal penalties … in addition to those provided for [here]." … Instead, "separate statutes set forth the [drug and RICO conspiracy offenses], and are intended to deter two different kinds of activity, i.e., conspiracy to engage in racketeering as opposed to conspiracy to violate narcotics laws."

*Id.*

> From these two other statutes, the *Mahdi* Court concluded, the language of

§ 1959(a)

> at least suggests that the Congress intended to impose for a VICAR violation a cumulative penalty separate from and in addition to what is authorized by a particular "law []of a [] State or the United States," as it did in enacting RICO and the CCE statute, based upon the showing of an additional statutory element in the case of VICAR, that the underlying violent offense bears a certain relationship to racketeering activity. At least this is a reasonable construction…

*Id.* at 889.

> There are two significant errors in the *Mahdi* Court's reasoning.

> First, prior precedents of the Supreme Court and this Court hold that

congressional intent regarding cumulative sentences is to be divined from the statute at issue and its legislative history. This Court is not authorized to draw inferences from the wording and legislative histories of wholly unrelated statutes like CCE, or similar statutes like RICO, both of which Congress enacted a decade earlier.

The danger of drawing such inferences is particularly problematic here. Having enacted the RICO statute in 1968, Congress, in 1984, when it enacted § 1959, was well aware of the RICO statute's provisions, and knew how courts across the country had interpreted that statute in relation to § 846. Had it intended sentences under § 1959(a) to be applied cumulatively with sentences for underlying violent crimes, as sentences for RICO conspiracy were applied cumulatively with sentences for narcotics conspiracy, it would have so stated.

Congress amended the CCE statute in 1984 when it enacted the VICAR statute. P.L. 98-473, 98th Cong., 2[d] Sess. (Oct. 12, 1984). Yet there is nothing in the legislative history cross-referencing the two provisions, or in any way supporting the *Mahdi* Court's holding that because Congress intended to impose cumulative punishment under the CCE statute, it intended the same under § 1959(a).

Second,

> The assumption underlying the [*Blockburger*] rule is that Congress
> ordinarily does not intend to punish the same offense under two different
> statutes. Accordingly, where two statutory provisions proscribe the "same
> offense," they are construed not to authorize cumulative punishments in the
> absence of a clear indication of contrary legislative intent.

*Whalen v. United States*, 445 U.S. 684, 691 – 2 (1980).

Based on its analogies to the CCE and RICO conspiracy statutes, the most the *Mahdi* Court could say in support of its conclusion that Congress intended to authorized cumulative punishment for substantive VICAR offenses and the predicate violent crimes is that the language of § 1959(a) "suggests that Congress

**United States v. Cordova, et al. — Page 49**

intended … to impose a cumulative penalty," and that its interpretation "at least []
is a reasonable construction…." *Mahdi, supra*, at 889.

In the end, the *Mahdi* Court conceded that first-degree premeditated murder
while armed and assault with intent to kill while armed in violation of the D.C.
Code are lesser-included offenses of VICAR murder and VICAR assault with a
dangerous weapon. It further conceded that neither the language of § 1959(a) nor
its legislative history provides "a clear indication" that Congress intended to
contravene the presumption against double punishment.

Therefore, its holding that a defendant can be convicted of the VICAR and
predicate D.C. offenses conflicted with precedent of the Supreme Court and this
Court. Appellants could not be convicted of both.

Similarly, Appellants could not be convicted under § 924(c) of possessing,
using or carrying a firearm in relation to a violent crime and § 22-4504(b) of
possession of a firearm during a crime of violence.

This Court analyzed the relationship between the version of § 924(c) in
effect before 1998 and D.C. Code § 22-3204(b), which in 2001 was recodified as
§ 22-4504(b). *United States v. McLaughlin*, 164 F.3[d] 1 (D.C. 1998). It found
nothing in the structure or legislative histories of the two statutes indicating
congressional intent to apply both to the same conduct. *Id.* at 12 – 13. It held that
the two statutes punished distinct crimes under the *Blockburger* test for two
reasons. First, the federal statute required proof that the defendant used or carried a
firearm during a federal drug trafficking or violent crime and the D.C. statute
required proof only of firearms possession. *Id.* at 12. Second, it noted that the
§ 924(c) count related to a charge under 18 U.S.C. § 1513(b) — retaliating against
a witness, victim or informant, and the § 22-3204(b) count related to a charge

**United States v. Cordova, et al. — Page  50**

under D.C. Code § 22-501[22] — assault with intent to kill. Because the two predicate offenses were not the same, the related firearms charges did not punish the same conduct. *McLaughlin, supra,* at 9 – 10, 13.

The Court highlighted another difference among elements of the two firearms statutes, but did not rely on it in reaching the decision. It said § 924(c) required proof of a " 'crime of violence' [] defined as a federal offense," and § 22-3204(b) required proof of D.C. offense. *Id.* at 12. The Court apparently interpreted the phrase "for which the person may be prosecuted in a court of the United States," as limiting the scope of § 924(c) to federal offenses.

A D.C. defendant can be prosecuted in a court of the United States for a D.C. Code offense that

is a felony and —

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 924(c)(3). Therefore, the *McLaughlin* Court's interpretation conflicts with the plain language of § 924(c)(1)(A).

Shortly before the Court decided *McLaughlin*, Congress amended § 924 to read:

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime … for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime,

---

[22] Recodifed as § 22-401.

**United States v. Cordova, et al. — Page 51**

possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime …

P.L. 105-386, 105th Cong., 2[d] Sess. (Nov. 13, 1998). The amendment negated the first distinction the Court drew in *McLaughlin* among elements of the federal and D.C. offenses.

As noted above, the *Mahdi* Court held that first-degree premeditated murder while armed and assault with intent to kill while armed are lesser-included offenses of VICAR murder and VICAR assault with a dangerous weapon.

In this case, with regard to the Ventura homicide and Maldonado assault, but not the Esquina-Flores assault, the § 924(c) and § 22-4504(b) counts charged the same offenses.

### The Trial Court's failure to resolve the multiplicity of charges before deliberations began was plain error

During discussion of final jury instructions, if not earlier, it should have become apparent to the Judge and all counsel that the D.C. charges were multiplicitous. At that point the Judge should have required the government to decide which substantive counts, the VICAR counts or the D.C. counts, to put before the jury. *Drew v. United States*, 331 F.2[d] 85, 88 (D.C. Cir. 1964)(*quoting McElroy v. United States*, 164 U.S. 76, 78 (1896)). At a minimum, the Judge should have insisted that the D.C. charges be identified as lesser-included offenses to be considered only if jurors acquitted an Appellant of the VICAR count or could not reach a unanimous verdict despite their "best efforts." *See, e.g. United States v. Fuller*, 455 F.2[d] 1338, 1340 (D.C. Cir. 1971). Thus, the error was plain.

As a result of the error Appellants were subjected to multiple punishments for the same offenses. But for purposes of this discussion the critical point is that inclusion of the multiplicitous charges, increasing the number of counts jurors had to decide, undoubtedly was prejudicial. The volume of charges, as Justices

**United States v. Cordova, et al. — Page 52**

Marshall and Stevens recognized, conveyed that Appellants are really bad men who must be guilty.

### *Appellants did not waive their right to challenge the multiplicitous charges*

The prejudicial multiplicity in this case was not due to a defective indictment. Because it arose from the unique jurisdictional relationship it could not have been cured by motion pretrial under Rule 12(b)(3). Therefore, the waiver provision of Rule 12(e) is not a bar to raising the issue on appeal.

This Court ruled in *United States v. Harris*, 959 F.2$^d$ 246, 250 – 1 (D.C. Cir. 1992), that Rule 12's waiver provision barred appellants from raising a multiplicity objection for the first time on appeal, "at least in the typical case where the defect appears on the face of the indictment." In that case the challenge was to counts under 21 U.S.C. §846 charging a narcotics conspiracy and under 18 U.S.C. §371 charging a conspiracy to use firearms in relation to the drug trafficking offense.

In *United States v. Clarke*, 24 F.3$^d$ 257, 261 (D.C. Cir. 1994), the Court again ruled that appellant waived his claim that two "facially indistinguishable" narcotics counts were multiplicitous by failing to object until after the trial began. The counts related to two caches of crack, and the Judge instructed jurors about the distinction.

In *Weathers I, supra*, 186 F.3$^d$ at 951 – 2, Appellant argued for the first time on appeal that a count under 18 U.S.C. § 115 charging threats against a federal prosecutor and under D.C. Code § 22-2307 charging threats against the same prosecutor were multiplicitous. He also argued that two counts under D.C. Code § 22-722(a)(6) of obstructing justice by threatening different individuals arose from a single offense. But the Court ruled that Weathers waived the objection by

**United States v. Cordova, et al. — Page 53**

failing to raise it before trial.[23]

In the vast majority of criminal cases, whether the indictment charges lesser-included-offenses or not, the government is entitled to jury instructions on them and that they be listed on the verdict form. This is so because in a progression of increasingly serious crimes a greater offense includes all elements of less serious offenses, i.e., simple assault through first-degree murder. *See United States v. Harley*, 990 F.2$^d$ 1340, 1344 (D.C. Cir. 1993)(*citing Schmuck v. United States*, 489 U.S. 705, 716 (1989)).

But in this case the lesser-included D.C. crimes are not part of the progression leading up to the VICAR crimes, and adding them at the end of the trial as lesser-included offenses for jury consideration would violate the Fifth Amendment Indictment Clause. Unless the indictment charged the D.C. crimes, in the event of a failure of proof of an element of the VICAR count, the government would suffer an acquittal. For example, if the government failed to prove the existence of a racketeering enterprise the jury would have to acquit on the VICAR count and, because the same sovereign enacted the D.C. statutes, the government would be barred from prosecuting the underlying D.C. crime in the Superior Court.

Under Fed. R. Crim. P. 8, the D.C. counts were properly joined with the federal charges in the indictment. *See, United States v. Carson*, 455 F.3$^d$ 336, 353 & n. 33 (D.C. Cir. 2006). If the Trial Court had forced the government before trial to prosecute either the VICAR charges or the D.C. charges the government undoubtedly would have sought appellate review, and probably would have

---

[23] In *United States v. Weathers (Weathers II)*, 493 F.3$^d$ 229, 239 (D.C. Cir. 2007), the Court held that trial counsel's failure to object to the multiplicitous § 115 and § 22-2307 counts amounted to constitutionally ineffective representation. The government conceded that the two counts merged. *Id.* at 237.

**United States v. Cordova, et al. — Page 54**

prevailed.

But, "once they were joined, the D.C. Code offenses operated like other federal offenses for purposes of severance…. [T]he trial judge ha[d] a continuing duty, under Fed. R. Crim. P. 14, at all stages of the trial to grant a severance if prejudice d[id] appear." *Carson, supra*. Therefore, Rule 12(e) does not bar Appellants from challenging the multiplicitous charges now because there is good cause for Appellants' failure to raise the issue pretrial.

### APPELLANTS' SENTENCES ARISING FROM THE APRIL AND JUNE 2007 INCIDENTS VIOLATE THE FIFTH AMENDMENT DOUBLE JEOPARDY CLAUSE

In relation to the Ventura homicide, the Trial Court imposed on each Appellant a mandatory life sentence for VICAR murder and 300 months for first-degree premeditated murder. For the Maldonado assault it imposed sentences of 240 months for VICAR assault and 90 months for assault with intent to kill while armed. It sentenced each to 60 months for the D.C. firearms count related to the April 22, 2007 incident. Those sentences are concurrent. In addition, the Court sentenced each to 120 months and 300 months for the two § 924(c) counts associated with the VICAR convictions.

For the reasons discussed above, Appellants could not be convicted of both the VICAR and lesser-included D.C. murder and assault offenses or the § 924(c) and related § 22-4504(b) offenses. Therefore, their cases must be remanded for the District Court to vacate the federal counts or the D.C. counts and resentence Appellants accordingly.

If the District Court vacates the D.C. counts it must also vacate one of each Appellant's § 924(c) sentences arising from the April 22, 2007 incident. *Anderson, supra*, at 1328. The consecutive sentences for the second count added 300 months to each Appellant's aggregate sentence.

**United States v. Cordova, et al. — Page  55**

In *Anderson* this Court rejected the argument that two violent crimes occurring simultaneously could subject a defendant to two § 924(c) convictions. "[I]f Congress had contemplated convictions for multiple 'uses' or 'carries' during one ongoing … crime of violence, it would have composed language that would clearly indicate that intent and make its implementation easier." *Id.* at 1332. From the legislative history, the Court concluded that "the statute's purpose [is] to penalize the choice of using or carrying a gun *in committing a crime.*" *Id.* at 1328 (emphasis in original). When two violent crimes are part of one course of criminal conduct the defendant can be convicted and sentenced only once for the decision to use a gun.

As the Second Circuit recently stated, "two § 924(c) convictions that are based on a 'single unit of prosecution,' i.e., that 'punish a defendant twice for continuous possession of a firearm in furtherance of co-terminus predicate offenses involving essentially the same conduct,' cannot stand." *United States v. Young*, 2014 U.S. App. LEXIS 6322, 23 (2$^d$ Cir. Apr. 4, 2014).

In *United States v. Cureton*, 739 F.3$^d$ 1032, 1040 (7th Cir. 2014), Appellant was convicted of interstate communication of a ransom request and attempted extortion arising from a single telephone call and two § 924(c) counts, one associated with each violent crime. Although the predicate offenses were not the same for double-jeopardy purposes, the Court said they arose from the same course of conduct. It reasoned that § 924(c)

> imposes its punishment based on the use of a firearm (and provides for increased punishment based on how the firearm is used) — not on the nature of the predicate offense. So the unit of prosecution is the use, carriage, or possession of a firearm during and in relation to a predicate offense.

*Id.* at 1043. *See, also, United States v. Severns*, 559 F.3$^d$ 274, 291 (5th Cir. 2009)(§ 924(c)(1) use-of-fire to simultaneously commit mail fraud and wire fraud).

**United States v. Cordova, et al. — Page 56**

*Cf. United States v. Rentz*, 735 F.3$^d$ 1245, 1250 (10th Cir. 2013); *United States v. Sandstrom*, 594 F.3$^d$ 634, 659 (8th Cir. 2010).

Because Appellants' convictions for VICAR murder and VICAR assault on April 22, 2007 arose from the same course of conduct, they could be convicted only once under § 924(c) for their actions that day. Therefore, one of each Appellant's § 924(c) convictions must be vacated and his consecutive sentence must be reduced by 300 months.

The same is true of the June 1, 2007 assault on Feliciana Esquina-Flores because one § 924(c) count, Count 13, relates to the VICAR maiming that day and the second, Count 14, relates to threats made "on or about June 1, 2007" — the same course of conduct. Indictment, 18; JA **. However, their § 22-4504(b) convictions relate to their D.C. assault with intent to kill while armed convictions, Count 15, which does not merge with either VICAR conviction.

The net result is that Mr. Cordova's and Mr. Gutierrez's consecutive sentences must be reduced by an additional 300 months each.

### THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING AN ENGLISH-SPEAKING GOVERNMENT WITNESS TO TESTIFY IN SPANISH THROUGH INTERPRETERS

#### *Standard of review*

The use of interpreters in the courtroom is a matter within the Trial Court's discretion, and its ruling on such a matter will be reversed only for clear error. *United States v. Mayans*, 17 F.3$^d$ 1174 (9th Cir. 1994).

#### *Misael Esquina-Flores did not need an interpreter*

When Misael Esquina-Flores testified as a government witness, through an interpreter, he was 22 years old, had lived in the United States since he was 14, and had attended Cardozo High School. Tr. 11/8/10PM, 82, 88; Tr. 11/10/10AM, 10.

**United States v. Cordova, et al. — Page  57**

Over the course of 1½ days, Esquina-Flores testified about Appellants' alleged admissions, firearms possession, and involvement in shootings — including the shooting of his mother. He claimed Mr. Cordova admitted that he was wanted in El Salvador for murders there. Tr. 11/9/10AM, 11 – 21; Tr. 11/9/10PM, 3 – 21, 36 – 45.

During cross-examination Esquina-Flores acknowledge that he spoke English in school and that he understood English. But, he said, "I prefer to speak Spanish because there are certain words that I don't quite understand." Tr. 11/10/10AM, 10.

At that point, defense counsel stated, "Your Honor, I am instructing the witness to answer in English and, if he has trouble, then he can ask the Court for help with interpretation." *Id.* When the government objected, the following discussion occurred at the bench:

> THE COURT:  Where did this come from, [Mr. Cordova's counsel]? Is this some sort of tactical …
>
> [MR. CORDOVA'S COUNSEL]:  No, it is not a tactical thing. I have done it before.
>
> …
>
> … The point is that when a Government witness speaks in Spanish, the jury doesn't get a real sense of being able to … judge their credibility because they don't understand him. They are [hearing] the … intonation of the speech and the way it is coming out through the interpreters.
>
> … [W]hat I am saying is that this man has admitted not only in front of the plea, … he even answered at least twice from what I can tell your Honor's questions when you posed them to him before the interpreter interpreted them, he answered them in English.
>
> …
>
> I am asking him simple questions on Cross-Examination and if he can

**United States v. Cordova, et al. — Page  58**

answer them in English, if he has problems, then he can use the interpreter; but I think it is a disadvantage for us and also for the jury in determining his credibility to have him continuously speak in Spanish when he understands exactly what we are saying.

Tr. 11/10/10AM, 11 – 12.

The Judge conceded that Esquina-Flores "may speak English well enough to sort of get by on the street," but said,

I have to tell you that the circumstances in this case are such as to this witness that it is pretty clear to me Spanish is his principal language…. I think it is frankly consistent with my understanding that his lawyers and the investigators who have always spoken with him in Spanish….

*Id.* at 14. He refused to require Esquina-Flores to testify in English.

### *Denial of the motions violated Appellants' constitutional rights*

"The central concern for the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of the fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

[T]he Confrontation Clause is generally satisfied when the defense is given full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.

*Id.* at 846 (*quoting, Ohio v. Roberts*, 448 U.S. 56, 69 (1980)).

In this case, the defense was put at a distinct disadvantage during cross-examination because, although the witness spoke English, the time within which he had to answer was necessarily extended because the questions were then repeated in Spanish. This gave the witness additional time to think through what answers he would give. Had the witness been required to answer in English, the jury would have become aware of the witness's hesitancy in answering. Moreover, the jury

was deprived of hearing the witness's intonation and inflections. These play an important role in judging the witness's credibility and bias.

Finally, there were numerous occasions during testimony of several government witnesses when there were questions about the accuracy of the translations, and about the possibility that jurors who understood Spanish were translating the testimony differently than the interpreters.  For instance, one Spanish-speaking juror expressed his concern to the judge about incorrect translations. Tr. 11/3/10AM, 26 – 42; JA **. In another instance, the interpreter did not interpret the witness's entire answer. Tr. 11/3/10PM, 29 – 30; JA **. Finally, there were instances where the interpreter had to correct previously provided incorrect interpretations. Tr. 11/2/10PM, 25; Tr. 11/3/10PM, 54; Tr. 11/9/10AM, 21; JA **.

### *The Trial Court violated 28 U.S.C. § 1827*

Before denying the motion to require Esquina-Flores to testify in English, the Judge failed to follow procedures required under 28 U.S.C. § 1827, which provides:

> (d)(1) The presiding judicial officer, … determines on such officer's own motion or on the motion of a party that such party (including a defendant in a criminal case), or a witness who may present testimony in such judicial proceedings —
>
>  (A) speaks only or primarily a language other than the English language….

The statute permits only witnesses with very limited English language proficiency to testify through interpreters.

In *Pietrzak v. United States*, 188 F.2$^d$ 418, 420 (5th Cir. 1951), the Court held that a witness could speak through an interpreter only if she were unable to testify intelligently without one. To make such a determination, the judge must make a

preliminary inquiry as to the necessity for appointing an interpreter, the Fifth Circuit said. It affirmed the decision not to use an interpreter because the Judge very carefully examined the witness and others, and was convinced that the witness understood the questions and was capable of testifying without an interpreter.

The Court in Appellants' case made no independent determination of Esquina-Flores's English proficiency. *See Mayans, supra*, at 1180 (observing witness trying to speak English is indispensible part of inquiry into need for interpreter, trial court required to determine linguistic abilities). It found only that Spanish was Esquina-Flores's first language, not that he primarily spoke Spanish. It relied on the government's assertion that investigators spoke to him in Spanish, and accepted the witness's preference to speak Spanish without asking the extent to which he spoke English in his daily life or was having difficulty understanding questions counsel asked.

No questions addressed to Esquina-Flores required language proficiency beyond the everyday English spoken on the streets. He merely recounted purported conversations he overheard or events he claimed to have observed. Moreover, the interpreter was in Court if he needed assistance.

The Judge's failure to balance Appellants' confrontation right against the witness's preference to speak Spanish, like his failure to weigh Appellants' need to assist their lawyers before issuing the protective order, deprived them of significant trial rights. In the absence of findings on the record supporting the Judge's ruling, to facilitate appellate review this Court should presume that Appellants' Fifth and Sixth amendment rights outweighed the competing interests. *Press-Enterprise, supra*.

This error was particularly prejudicial because Esquina-Flores was a primary government witness who provided significant testimony against each Appellant. Therefore, it was of the utmost importance that the jury hear his words and

**United States v. Cordova, et al. — Page  61**

intonation to assess his credibility.

### APPELLANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THEY WERE DENIED THEIR RIGHT TO REPRESENTATION BY TWO ATTORNEYS PURSUANT TO 18 U.S.C. § 3005

### *Introduction*

The government filed notice February 16, 2010 that it did not intend to seek the death penalty as to each Appellant. *United States v. Cordova, et al.*, Dkt. No. 08-Cr.-167, Docs. 34, 36, 37, *filed* Feb. 16, 2010; JA **. The District Court advised counsel March 18, 2010 "that since it is not going to be a death penalty case, the public is not required to pay for two lawyers for each defendant. I cannot in good conscience, at taxpayer expense, have the taxpayer paying for two lawyers for each defendant." Tr. 3/18/10, 8; JA **.

Counsel objected.  *Id.* at 13 – 14, 18 – 19; JA **.  But the Judge rejected their arguments. *Id.* at 21; JA **.

### *Standard of review*

Because Appellants' argument poses a question of statutory interpretation, this Court reviews the ruling *de novo. United States v. Wishnefsky*, 7 F.3$^d$ 254, 256 (D.C. Cir. 1993).

### *The statutory right to two attorneys*

Congress first created the right to two attorneys in a capital case in 1790. 1 Stat. 1790. It enacted 18 U.S.C. § 563 in 1927, to "provide that every person [indicted] for a capital offense shall be allowed to make his full defense by counsel learned in the law, and the court before which he is tried shall 'upon request, assign to him such counsel, not to exceed two, as he may desire, and they shall have free access to him for all seasonable (sic) hours.' " *Crum v. Hunter*, 151 F.2$^d$ 359, 360 – 61 (10th Cir. 1945). In 1948, 18 U.S.C. § 3005 incorporated the language of § 563.

When it passed the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591, *et seq.*, Congress amended § 3005:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon defendant's request assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours.

Section 3005 creates a right to two attorneys even though the government chose not to seek the death penalty.

### Cases Interpreting § 3005

This is a case of first impression in this Circuit.

The first case to address this issue was *United States v. Watson*, 496 F.2[d] 1125 (4th Cir. 1973), a capital case in which the District Court appointed two attorneys. While it was pending, the U.S. Supreme Court decided *Furman v. Georgia*, 408 U.S. 238 (1972), holding the death penalty unconstitutional. Watson's Trial Judge insisted that the second lawyer withdraw from the case.

But the Fourth Circuit ordered a new trial, saying, "Section 3005 is unequivocal in its terms. We have no right to rewrite it, nor do we have any right to provide a district court with the discretion to apply it that Congress purposefully and unambiguously withheld." *Watson, supra*, at 1130.

In *United States v. Boone*, 245 F.3[d] 352 (4th Cir. 2001), the government argued that the phrase "learned in the law of capital cases," added in 1994, signified Congress's intent that only defendants actually exposed to the death penalty be afforded two lawyers. Rejecting that argument, the Fourth Circuit held that, according to the "plain text" of § 3005, the trigger requiring appointment of two lawyers is the "*indictment* for a capital crime not the later decision by the government to seek or not seek the death penalty." *Id.* at 359 (emphasis in

original). If Congress intended by adding "learned in the law of capital cases" to limit availability of two lawyers to cases in which the death penalty is actually sought, "it could easily have done so." *Id.* at 360.[24]

By contrast, in *Furman's* wake, the Seventh and Ninth Circuits held that only defendants actually exposed to the death penalty had a right to two lawyers. "[T]he purpose of the two-attorney right is 'to reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel.' " *United States v. Shepherd*, 576 F.2d 719, 729 (7th Cir. 1978).

"Since the statute's purpose … derives from the severity of the punishment rather than the nature of the offense, the elimination of the death penalty eliminates [Defendant's] right … to a second court-appointed attorney." *United States v. Dufur*, 648 F.2d 512, 515 (9th Cir. 1980).

Then, the Ninth Circuit (post-*Furman*) held that a defendant's right to two attorneys ends once the government chooses not to pursue the death penalty. *United States v. Waggoner*, 339 F.3d 915 (2003). The Court reasoned that the federal death penalty statute required the government first to give notice of intent to seek the death penalty and specify the aggravating factors upon which it intends to rely. If a defendant is convicted of the death qualifying offense, the government must prove the qualifying factors beyond a reasonable doubt, making the aggravating factors elements of the capital offense. The additional elements make a capital offense distinct from the underlying offense, the Ninth Circuit held. Just as all murders cannot be capital murders, it concluded that the term "capital crime" in

---

[24] The Fourth Circuit again addressed § 3005 in *United States v. Shepperson*, 739 F.3d 176 (4th Cir. 2014). Relying on the phrase "upon defendant's request," it held that a District Court is not under an affirmative duty to advise a defendant of his right to additional counsel. *Shepperson* reaffirms the Fourth Circuit's reliance on the plain language of the statute in determining a criminal defendant's rights.

**United States v. Cordova, et al. — Page  64**

§ 3005 does not encompass the underlying offense when capital punishment cannot be imposed. *Id.* at 918. Under the Ninth Circuit approach, a capital crime does not become a capital crime until notice is provided and the defendant is advised of the aggravating factors which the government intends to prove at trial beyond a reasonable doubt.

Other circuits have followed the Ninth Circuit's approach to the applicability of § 3005's two-attorney requirement. *See United States v. Douglas*, 525 F.3[d] 225, 237 (2[d] Cir. 2008)(once government informs court, defendant it will not seek death penalty, matter is no longer capital case); *United States v. Casseus*, 282 F.3[d] 253, 256 (3[d] Cir. 2002)(after government declared it would not seek death penalty defendants no longer capital defendants); *United States v. Grimes*, 142 F.3[d] 1342, 1347 (11th Cir. 1998)(defendant not entitled to benefits he would receive in capital case if government will not seek death penalty or death penalty otherwise unavailable by force of law).

The Fourth Circuit approach, defining a capital offense as an offense for which the maximum penalty is execution, is the better of the two. First, it is premised on a plain reading of the statute, as opposed to unsupported suppositions as to Congress's intent.

Second, under the Ninth Circuit's approach, the definition of "capital case" will vary from statute to statute. Under § 3005, a case would no longer be a "capital case" once the government decides it will not pursue the death penalty. Yet, in the context of the statute of limitations or eligibility for bail, it has been held that courts look to the character of the offense and whether it is punishable by

**United States v. Cordova, et al. — Page  65**

death, regardless of whether the death penalty is actually sought.[25] *See United States v. Payne*, 591 F.3[d] 46 (2[d] Cir. 2010)(5-year limitations did not apply to § 1959(a)(1) count even though no aggravating factors found); *United States v. Edwards*, 159 F.3[d] 1117 (8th Cir. 1998)(§ 3281 applied in a murder by arson case even though death penalty procedures in charging document had been ruled unconstitutional). The Second Circuit has held that 18 U.S.C. § 3148 (Supp. IV 1969), denying bail to defendants charged with offenses punishable by death, can apply even if the government does not seek the death penalty. *United States v. Kostadinov*, 721 F.2[d] 411 (2[d] Cir. 1983).

The plain language of § 3005 states that, upon request, two attorneys are required for a defendant charged with a capital offense. Had Congress intended otherwise, the statute would provide as such. Moreover, because the interpretation of "capital case" in other statutes is not dependent upon the death penalty actually being sought, that approach should apply to § 3005 to avoid inconsistencies in statutory interpretation.

Because of this statutory violation, Appellants are entitled to a new trial without demonstrating that the Judge's error was prejudicial.

> From the record it is possible to conclude that defendant was fairly tried and the evidence of his guilt was substantial, if not overwhelming, and from this it may be inferred that defendant was not prejudiced by the denial of his right. In this connection, however, we recognize the almost insuperable difficulty that would be placed upon any defendant … to show *post hoc* that he was prejudiced by denial of his right to two attorneys.

---

[25] 18 U.S.C. § 3281 states, "An indictment for any offense punishable by death may be found at any time without limitation," while § 3282 imposes a 5-year statute of limitations for non-capital murder.

**United States v. Cordova, et al. — Page 66**

*Watson, supra*, at 1129. *See, also, Smith v. United States,* 353 F.2[d] 838, 846 (D.C. Cir. 1965)(prejudice presumed from failure of trial court to inform defendant of his right to two attorneys).

### The Court abused its discretion by not allowing the continued representation of two attorneys

The District Court abused its discretion by requiring one lawyer representing each Appellant to withdraw after the government decided not to seek the death penalty. The Federal Defender Service CJA administration guide states, "In an extremely difficult case where the court finds it in the interest of justice to appoint an additional attorney, each attorney is eligible to receive the maximum compensation allowable under the CJA." GUIDE TO JUDICIARY POLICY, Vol. 7, Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 2: Appointment and Payment of Counsel, Compensation of Counsel, § 230.53.20.

After the government announced its decision, defense counsel argued that each Appellant faced life imprisonment, that the case was complex, and that an ongoing investigation in El Salvador might produce additional charges. Counsel argued that, under the government's theory, MS-13 is an international criminal enterprise of which Appellants were members, not a local enterprise comprised of Appellants and their associates. As a result, the additional lawyers were needed to respond to the government's strategy.

They noted that Appellants were non-English speakers and one lawyer representing each spoke Spanish. The financial savings derived from removing one lawyer from each defense team would be offset by the cost of hiring interpreters to assist the remaining counsel and their investigators.

Counsel cited cases in which other D.C. District Court judges, under similar circumstances, allowed defendants to proceed with two lawyers. Tr. 3/18/10, 13 –

14, 18 – 19; JA **.[26] Removing one lawyer from each defense team deprived Appellants of the caliber of representation afforded similarly situated defendants in the District Court, counsel argued.

Under the circumstances of this case, the Judge's decision to remove one lawyer from each defense team deprived Appellants of full and fair representation under § 3005 and the Sixth Amendment.

### THERE WAS INSUFFICIENT EVIDENCE TO CONVICT MR. CORDOVA AND MR. GUTIERREZ OF MAIMING IN AID OF RACKETEERING

The government's theory at trial about the June 1, 2007 assault on Feliciana Esquina-Flores was that Mr. Cordova and Mr. Gutierrez committed the crime to maintain or enhance their positions in MS-13. But the evidence prosecutors presented demonstrated that Appellants' motive was retaliation after Esquina-Flores ordered them to move out of her residence, not concern about their stature in MS-13.

Mr. Cordova and Mr. Gutierrez were tenants in the Esquina-Flores home, Mr. Cordova beginning in June 2006 and Mr. Gutierrez beginning in December 2006. They paid no rent, made no contributions for food, and Mr. Cordova refused to pay for calls he made to El Salvador. Tr. 11/18/10AM, 62; JA **. In late May 2007, Feliciana Esquina-Flores ordered them to move out. *Id.*.

Contrary to the government's theory, several witnesses testified that the eviction letter, written after an argument over finances and marijuana use in the

---

[26] Despite the government's decision not to seek the death penalty, defendants were allowed to keep two attorneys in *United States v. Pray, et al.*, Dkt. No. 10-Cr.-051*; United States v. Gray, et al.,* Dkt. No. 00-Cr.-157; *United States v. Edelin, et al.*, Dkt. No. 98-Cr.-264.

house, prompted the shooting.[27] Tr. 11/9/10AM, 7, 35, 36, 46; 11/18/10AM, 48, 54, 59, 62, 63; JA **.

The government produced no evidence of Appellants' mental states from which reasonable jurors could have inferred a correlation between the assault and their status in MS-13. The only basis for such a finding would have been the improper inference that because they were MS-13 members, gang status motivated every illegal act they committed.

### Standard of review

This court reviews a denial of a Motion for Judgment of Acquittal *de nova*. *United States v. Gooch*, 665 F.3$^d$ 1318, 1326 (D.C. Cir. 2012); *United States v. Kayode,* 254 F.3$^d$ 204, 212 (D.C.Cir.2001). *See also*, *United States v. Green*, 599 F.3$^d$ 360, 367 (4th Cir.), *cert. denied*, 131 S. Ct. 271 (2010).

### The government produced no motive evidence linking the assault to Appellants' gang status

To establish a violation of § 1959(a) the government must prove the defendant received a benefit from an alleged racketeering enterprise in return for committing the charged violent crime. One way to prove that element is to produce evidence that the defendant's motive was to gain entrance to, maintain membership in, or advance within the enterprise. *Gooch, supra*, at 1337.

From the evidence presented in this case, no reasonable juror could infer that Mr. Cordova and Mr. Gutierrez attacked Feliciana Esquina-Flores to further MS-13's purpose or out of concern over their positions in it.

In a similar case involving alleged members of a racketeering enterprise, the Second Circuit vacated several convictions after concluding that Appellants' roles

---

[27] Among the witnesses were Misael Esquina-Flores; José Esquina-Ramos; Feliciana Esquina-Flores.

**United States v. Cordova, et al. — Page  69**

in the enterprise did not motivate the charged violent crimes. *United States v. Bruno*, 383 F.3$^d$ 65 (2$^d$ Cir. 2004). In that case, Polito, a Zito Crew member, sought to switch allegiance to the Malangone Crew to avoid paying gambling debts owed to other Zito Crew members. Both crews were sub-sets of the Genovese Crime Family. Explaining its holding that the government failed to prove the "consideration" element of § 1959(a), the Court said:

> … the evidence established that Polito had several motivations for wanting to kill Lombardi and D'Urso: Polito owed them significant amounts of money from loansharking; he believed that D'Urso had previously "set him up" for a robbery; and he wanted to switch from Zito's crew to Malangone's crew to increase his chances of securing ill-gotten gains. The Government argues on appeal that it was this last motivation that satisfied the "position related" element of § 1959. The Government[] … cites no authority — and we have found none — for the proposition that an associate of an organized crime family switching from one crew to another is *per se* evidence of maintaining or increasing his position in a criminal enterprise…. [W]e think it simply too tenuous to conclude that switching from a temporarily less active crew to a more active crew within the same organized crime family was likely to result in Polito maintaining or advancing his position in that enterprise.

*Id.* at 84.

Feliciana Esquina-Flores testified that she wanted Mr. Cordova and Mr. Gutierrez to leave her house because they refused to pay rent or contribute to living expenses.  Tr. 11/18/10AM, 48, 54, 59, 62, 63; JA **.

Misael Esquina-Flores testified that his family, Mr. Cordova, and Mr. Gutierrez came from the same village in El Salvador. Tr. 11/9/10AM, 4; JA **. Misael was acquainted with Mr. Cordova in El Salvador and later became aware that Appellant was an MS-13 member. Tr. 11/9/10AM, 19; JA **. Feliciana Esquina-Flores welcomed them into her home and helped Mr. Cordova get a job shortly after he arrived. She ordered them to leave solely because they refused to pay rent or contribute to living expenses and they smoked marijuana in her house.

**United States v. Cordova, et al. — Page  70**

The shooting occurred shortly after she gave them the eviction notice.

There was no evidence that MS-13 sanctioned the shooting or that Mr. Cordova or Mr. Gutierrez publicized the incident among MS-13 members. Feliciana Esquina-Flores was not a *chivala* — a rival gang member, a law enforcement officer, or anyone else against whom MS-13 regularly commit violent crimes.

From the evidence the government presented, a reasonable juror could conclude only that this was a personal affair, unrelated to their roles as MS-13 members. As the Second Circuit ruled in *Bruno*, jurors could convict Appellants of VICAR maiming in relation to the assault on Feliciana Esquina-Flores only if they found *per se* that gang stature motivated every violent crime they committed.

Therefore, the government failed to prove an essential element under § 1959(a), that they assaulted Feliciana Esquina-Flores with the expectation that doing so would maintain or improve their stature in MS-13.

## CONCLUSION

For the reasons stated above and any others that appear to the Court after oral argument, Appellants request that their convictions be vacated and their cases returned to the District Court for a new trial before a different District Judge. If the Court concludes they are not entitled to a new trial, Appellants request a remand to the District Court with instructions to vacate merged counts and to impose sentences that do not violate the Fifth Amendment Double Jeopardy Clause.

Respectfully submitted,

_____/s/_____
Mary E. Davis
Davis & Davis
1350 Connecticut Avenue, N.W.
Suite 202
Washington, D.C. 20036
(202) 234-7300
Attorney for William Cordova

_____
Robert S Becker, Esq.
D.C. Bar No. 370482
PMB # 155
5614 Connecticut Avenue, N.W.
Washington, D.C. 20015
(202) 364-8013
Attorney for Melvin Sorto

*All counsel appointed by the Court*

_____/s/_____
Anthony D. Martin
7841 Belle Point Drive
Greenbelt, Maryland 20770
(301) 220-3700
Attorney for José Gutierrez

**United States v. Cordova, et al. — Page 72**

**ADDENDA**

# TABLE OF CONTENTS

## Relevant Statutes

**18 U.S.C. § 115** — 3

**18 U.S.C. § 924** — 3

**18 U.S.C. § 1959** — 4

**18 U.S.C. § 3005** — 5

**18 U.S.C. § 3231** — 5

**18 U.S.C. § 3281** — 5

**18 U.S.C. § 3500** — 5

**21 U.S.C. § 846** — 6

**21 U.S.C. § 848** — 6

**28 U.S.C. § 455** — 7

**28 U.S.C. § 1654** — 7

**D.C. Code § 22-401** — 7

**D.C. Code § 22-406** — 7

**D.C. Code § 22-722** — 8

**D.C. Code § 22-2101** — 9

**D.C. Code § 22-4502** — 9

**D.C. Code § 22-4504** — 10

## Relevant Rules

**Fed. R. App. P. 10** — 10

**Fed. R. Crim. P. 8** — 11

**Fed. R. Crim. P. 12** — 11

**Fed. R. Crim. P. 14** — 11

### U.S. Code

18 U.S.C. § 115.  Influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member

(a) (1) Whoever--

(A) assaults, kidnaps, or murders, or attempts or conspires to kidnap or murder, or threatens to assault, kidnap or murder a member of the immediate family of a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under section 1114 of this title [18 USCS § 1114]; or

(B) threatens to assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or an official whose killing would be a crime under such section,

with intent to impede, intimidate, or interfere with such official, judge, or law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such official, judge, or law enforcement officer on account of the performance of official duties, shall be punished as provided in subsection (b).

(2) Whoever assaults, kidnaps, or murders, or attempts or conspires to kidnap or murder, or threatens to assault, kidnap, or murder, any person who formerly served as a person designated in paragraph (1), or a member of the immediate family of any person who formerly served as a person designated in paragraph (1), with intent to retaliate against such person on account of the performance of official duties during the term of service of such person, shall be punished as provided in subsection (b).

18 U.S.C. § 924.  Penalties [Caution: See prospective amendment notes below.]

…

(c) (1) (A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years;

**Addenda — Page A-3**

and

     (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

…

(3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and--

     (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

     (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

## 18 U.S.C. § 1959. Violent crimes in aid of racketeering activity

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished--

(1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

(2) for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

(3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

(4) for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

(5) for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

(6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine [of] under this title, or both.

(b) As used in this section--

(1) "racketeering activity" has the meaning set forth in section 1961 of this title [18 USCS § 1961]; and

(2) "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is

**Addenda — Page A-4**

engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 3005.  Counsel and witnesses in capital cases

Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. The defendant shall be allowed, in his defense to make any proof that he can produce by lawful witnesses, and shall have the like process of the court to compel his witnesses to appear at his trial, as is usually granted to compel witnesses to appear on behalf of the prosecution.

18 U.S.C. § 3231.  District courts

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

18 U.S.C. § 3281.  Capital offenses

An indictment for any offense punishable by death may be found at any time without limitation.

18 U.S.C. § 3500.  Demands for production of statements and reports of witnesses

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be

delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its

use in the trial.

21 U.S.C. § 846.  Attempt and conspiracy

Any person who attempts or conspires to commit any offense defined in this title shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 848.  Continuing criminal enterprise
…
(b) Life imprisonment for engaging in continuing criminal enterprise. Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a), if--

  (1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

  (2) (A) the violation referred to in subsection (c)(1) involved at least 300 times the quantity of a substance described in subsection 401(b)(1)(B) of this Act [21 USCS § 841(b)(1)(B)], or

    (B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $ 10 million dollars in gross receipts during any twelve-month period of its existence

for the manufacture, importation, or distribution of a substance described in section 401(b)(1)(B) of this Act [21 USCS § 841(b)(1)(B)].

(c) "Continuing criminal enterprise" defined. For purposes of subsection (a), a person is engaged in a continuing criminal enterprise if--

   (1) he violates any provision of this title or title III the punishment for which is a felony, and

   (2) such violation is a part of a continuing series of violations of this title or title III--

      (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

      (B) from which such person obtains substantial income or resources.

28 U.S.C. § 455.  Disqualification of justice, judge, or magistrate [magistrate judge]

(a) Any justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 …

28 U.S.C. § 1654.  Appearance personally or by counsel

In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

### D.C. Code

D.C. Code § 22-401. Assault with intent to kill, rob, or poison, or to commit first degree sexual abuse, second degree sexual abuse or child sexual abuse

   Every person convicted of any assault with intent to kill or to commit first degree sexual abuse, second degree sexual abuse, or child sexual abuse, or to commit robbery, or mingling poison with food, drink, or medicine with intent to kill, or idnappin poisoning any well, spring, or cistern of water, shall be sentenced to imprisonment for not less than 2 years or more than 15 years. In addition to any other penalty provided under this section, a person may be fined an amount not more than the amount set forth in § 22-3571.01.

D.C. Code § 22-406. Mayhem or maliciously disfiguring

   Every person convicted of mayhem or of maliciously disfiguring another shall be imprisoned for not more than 10 years. In addition to any other penalty provided under this section, a

**Addenda — Page A-7**

person may be fined an amount not more than the amount set forth in § 22-3571.01.

D.C. Code § 22-722. Prohibited acts; penalty

(a) A person commits the offense of obstruction of justice if that person:

(1) Knowingly uses intimidation or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a juror in the discharge of the juror's official duties;

(2) Knowingly uses intimidating or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a witness or officer in any official proceeding, with intent to:

(A) Influence, delay, or prevent the truthful testimony of the person in an official proceeding;

(B) Cause or induce the person to withhold truthful testimony or a record, document, or other object from an official proceeding;

(C) Evade a legal process that summons the person to appear as a witness or produce a document in an official proceeding; or

(D) Cause or induce the person to be absent from a legal official proceeding to which the person has been summoned by legal process;

(3) Harasses another person with the intent to hinder, delay, prevent, or dissuade the person from:

(A) Attending or testifying truthfully in an official proceeding;

(B) Reporting to a law enforcement officer the commission of, or any information concerning, a criminal offense;

(C) Arresting or seeking the arrest of another person in connection with the commission of a criminal offense; or

(D) Causing a criminal prosecution or a parole or probation revocation proceeding to be sought or instituted, or assisting in a prosecution or other official proceeding;

(4) Injures or threatens to injure any person or his or her property on account of the person or any other person giving to a criminal investigator in the course of any criminal investigation information related to a violation of any criminal statute in effect in the District of Columbia;

**Addenda — Page A-8**

(5) Injures or threatens to injure any person or his or her property on account of the person or any other person performing his official duty as a juror, witness, or officer in any court in the District of Columbia; or

(6) Corruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding.

D.C. Code § 22-2101. Murder in the first degree -- Purposeful killing; killing while perpetrating certain crimes

Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate an offense punishable by imprisonment in the penitentiary, or without purpose to do so kills another in perpetrating or in attempting to perpetrate any arson, as defined in § 22-301 or § 22-302, first degree sexual abuse, first degree child sexual abuse, first degree cruelty to children, mayhem, robbery, or idnapping, or in perpetrating or attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, or in perpetrating or attempting to perpetrate a felony involving a controlled substance, is guilty of murder in the first degree. For purposes of imprisonment following revocation of release authorized by § 24-403.01(b)(7), murder in the first degree is a Class A felony.

D.C. Code § 22-4502. Additional penalty for committing crime when armed

(a) Any person who commits a crime of violence, or a dangerous crime in the District of Columbia when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machine gun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles):

(1) May, if such person is convicted for the first time of having so committed a crime of violence, or a dangerous crime in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a period of imprisonment which may be up to, and including, 30 years for all offenses except first degree murder while armed, second degree murder while armed, first degree sexual abuse while armed, and first degree child sexual abuse while armed, and shall, if convicted of such offenses while armed with any pistol

**Addenda — Page A-9**

or firearm, be imprisoned for a mandatory-minimum term of not less than 5 years; and

    (2) Shall, if such person is convicted more than once of having so committed a crime of violence, or a dangerous crime in the District of Columbia, or an offense in any other jurisdiction that would constitute a crime of violence or dangerous crime if committed in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a period of imprisonment of not less than 5 years and, except for first degree murder while armed, second degree murder while armed, first degree sexual abuse while armed and first degree child sexual abuse while armed, not more than 30 years, and shall, if convicted of such second offense while armed with any pistol or firearm, be imprisoned for a mandatory-minimum term of not less than 10 years.

    (3) Shall, if such person is convicted of first degree murder while armed, second degree murder while armed, first degree sexual abuse while armed, or first degree child sexual abuse while armed, be sentenced, in addition to the penalty provided for such crime, to a period of imprisonment of not less than the minimum and mandatory minimum sentences required by subsections (a)(1), (a)(2), (c) and (e) of this section and § 22-2104, and not more

than life imprisonment or life imprisonment without possibility of release as authorized by § 24-403.01(b-2); § 22-2104; § 22-2104.01; and §§ 22-3002, 22-3008, and 22-3020.

    (4) For purposes of imprisonment following revocation of release authorized by § 24-403.01(b)(7), the offenses defined by this section are Class A felonies.

D.C. Code § 22-4504. Carrying concealed weapons; possession of weapons during commission of crime of violence; penalty
…
    (b) No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22-4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

## Federal Rules

Fed. R. App. P. 10.  The Record on Appeal

…

(c) Statement of the Evidence When the Proceedings Were Not Recorded or When a Transcript Is Unavailable. If the transcript of a hearing or trial is unavailable, the appellant may prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement must be served on the appellee, who may serve objections or proposed amendments within 14 days after being served. The statement and any objections or proposed amendments must then be submitted to the district court for settlement and approval. As settled and approved, the statement must be included by the district clerk in the record on appeal.

Fed. R. Crim. P. 8.  Joinder of Offenses or Defendants

(a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 12.  Pleadings and Pretrial Motions [Caution: For amendments effective December 1, 2014, see prospective amendment note below.]

…

(b) Pretrial Motions.

…

   (3) *Motions That Must Be Made Before Trial.* The following must be raised before trial:

 …

   (B) a motion alleging a defect in the indictment or information--but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense;

…

(e) Waiver of a Defense, Objection, or Request. A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides. For good cause, the court may grant relief from the waiver.

Fed. R. Crim. P. 14.  Relief from Prejudicial Joinder

(a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Rule 43.  Defendant's Presence

(a) When Required. Unless this rule,

**Addenda — Page A-11**

Rule 5, or Rule 10 provides otherwise, the defendant must be present at:

  (1) the initial appearance, the initial arraignment, and the plea;

  (2) every trial stage, including jury impanelment and the return of the verdict; and

  (3) sentencing.

(b) When Not Required. A defendant need not be present under any of the following circumstances:

…

  (3) *Conference or Hearing on a Legal Question.* The proceeding involves only a conference or hearing on a question of law.

 …

## <u>CERTIFICATE AS TO TYPE VOLUME</u>

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(B)(i) and D.C. Cir. R. 32(a)(3)(C), that the attached Joint Brief of Appellants contains 20,943 words as measured using the word processor word count utility. This Court granted permission to file one or more briefs on behalf of Appellants totaling no more than 28,000 words.

_____
Robert S. Becker

## <u>CERTIFICATE OF SERVICE</u>

I, Robert S. Becker, counsel for Melvin Sorto, certify on May 16, 2014 that all counsel in this case are registered users of the Court's CM/ECF system and will receive service electronically.

_____
Robert S. Becker